# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF KENTUCKY (Bowling Green Division)

| | |
|---|---|
| HONORABLE THOMAS MASSIE, HONORABLE RAND PAUL, HONORABLE ANDY BIGGS, HONORABLE DAN BISHOP, HONORABLE LAUREN BOEBERT, HONORABLE ANDREW CLYDE, HONORABLE WARREN DAVIDSON, HONORABLE BOB GOOD, HONORABLE PAUL GOSAR, HONORABLE MARJORIE TAYLOR GREENE, HONORABLE BRIAN MAST, HONORABLE ALEX MOONEY, HONORABLE BARRY MOORE, HONORABLE RALPH NORMAN, HONORABLE BILL POSEY, HONORABLE MATT ROSENDALE, and HONORABLE CHIP ROY, | Civil Action No. 1:22-cv-00031-BNB-HBB |

                              Plaintiffs,

     v.

CENTERS FOR DISEASE CONTROL AND PREVENTION; ROCHELLE P. WALENSKY in her official capacity as Director of Centers for Disease Control and Prevention; and SHERRI A. BERGER in her official capacity as Chief of Staff of Centers for Disease Control and Prevention,

                              Defendants.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

FACTS .................................................................................................................. 1

    The CDC's Mask Mandate ............................................................................... 1

    The Members' Standing and Damages ........................................................... 2

LAW AND ARGUMENT...................................................................................... 3

  A.    Legal Standard ..................................................................................... 3

  B.    The Members Are Likely to Succeed on the Merits .......................... 3

        1.    The CDC lacks any statutory authority to adopt the Mask Mandate ............... 4

        2.    The regulations at issue do not authorize the action taken either .................... 10

        3.    Any authority granted to the CDC from Congress violates the Nondelegation Doctrine and raises issues under the Major Questions Doctrine ...................................................................................... 11

  C.    Members Will Suffer Irreparable Harm in the Absence of the Preliminary Injunction ..................................................................... 14

  D.    No Other Party Would Be Harmed by an Injunction and the Public Interest Would Be Served .......................................................... 15

  E.    Scope of the Requested Preliminary Injunction ................................ 16

CONCLUSION .................................................................................................... 17

CERTIFICATE OF SERVICE ............................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
　141 S. Ct. 2485 (2021) ............................................................. 4, 5, 7, 8

*Bond v. United States*,
　564 U. S.211 (2011) ...................................................................... 15

*Bond v. United States*,
　572 U.S. 844 (2014) ......................................................................... 9

*Bowsher v. Synar*,
　478 U. S. 714 (1986) ..................................................................... 15

*Canton Police Benevolent Ass'n of Canton v. United States*,
　844 F.2d 1231 (6th Cir. 1988) .......................................................... 5

*Certified Restoration Dry Cleaning Network*,
　*L.L.C. v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007) ............................. 3

*City of Chicago v. Barr*,
　961 F.3d 882 (7th Cir. 2020) ........................................................... 16

*City of Chicago v. Sessions*,
　888 F.3d 272 (7th Cir. 2018) ........................................................... 16

*Clinton v. City of New York*,
　524 U. S. 417 (1998) ..................................................................... 15

*Donovan v. Firstcredit, Inc.*,
　983 F.3d 246 (6th Cir. 2020) ............................................................. 6

*Elrod v. Burns*,
　427 U.S. 347 (1976) ...................................................................... 15

*Florida v. Becerra*,
　2021 WL 2514138, 2021 U.S. Dist. LEXIS 114297 ............................. 5, 8, 9

*Foster v. Dilger*,
　2010 U.S. Dist. LEXIS 95195 (EDKY 2010) ....................................... 16

*Gomez v. United States*,
　490 U.S. 858 (1989) ......................................................................... 6

*Gundy v. United States*,
　139 S. Ct. 2116 (2019) ................................................................... 13

*In re DeLorean Motor Co.*,
    755 F.2d 1223 (6th Cir. 1985) ............................................................................... 3

*Industrial Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) ............................................................................................... 14

*Martin-Marietta Corp. v. Bendix Corp.*,
    690 F.2d 558 (6th Cir. 1982) ............................................................................... 16

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................................................. 9

*Mistretta v. United States*,
    488 U.S. 361 (1989) ......................................................................................... 12, 17

*Mori v. Int'l Bhd. of Boilermakers*,
    454 U.S. 1301 (1981) ........................................................................................... 14

*Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*,
    142 S. Ct. 661 (2022) ...................................................................................... 14, 15

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019) ............................................................................................. 6

*NLRB v. Canning*,
    573 U.S. 513 (2014) .............................................................................................. 15

*Northeast Ohio Coalition for the Homeless v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006) ............................................................................... 3

*Ohio Oil Co. v. Conway*,
    279 U.S. 813 (1929) .............................................................................................. 15

*Parker v. Metro. Life Ins. Co.*,
    121 F.3d 1006 (6th Cir. 1997) ............................................................................. 5

*Paul v. United States*,
    140 S. Ct. 342 (2019) ...................................................................................... 12, 13

*Philip Morris USA Inc. v. Scott*,
    561 U.S. 1301 (2010) ........................................................................................... 14

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ............................................................................................... 9

*Suster v. Marshall*,
    149 F.3d 523 (6th Cir. 1998) ............................................................. 3

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ...................................................................... 14

*Tiger Lily, LLC v. United States HUD*,
    5 F.4th 666 (6th Cir. 2021) .......................................................... 5, 6,

*Trump v. Int'l Refugee Assistance Project*,
    137 S. Ct. 2080 (2017) ................................................................... 1

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ....................................................................... 3

*Vitolo v. Guzman*,
    999 F.3d 353 (6th Cir. 2021) ....................................................... 16

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ..................................................................... 13

**Statutes**

5 U.S.C. § 702 ...................................................................................... 14

5 U.S.C. § 706 ....................................................................................... 4

5 U.S.C. § 804 ...................................................................................... 13

20 U.S.C. § 3508 .................................................................................... 4

42 U.S.C. § 264 ............................................................................. passim

42 C.F.R. § 70.2 ............................................................................... 3, 10

42 C.F.R. § 71.31 ............................................................................. 3, 10

42 C.F.R. § 71.32 ........................................................................ 3, 10, 11

U.S. Const. Art. I, § I ......................................................................... 12

**Other Authorities**

https://www.tsa.gov/news/press/statements/2022/03/10/
statement-regarding-face-mask-use-public-transportation .............................1

https://www.cdc.gov/healthywater/global/sanitation/index.html.........................8

Black's Law Dictionary, 1060 (6th ed. 1990)................................................................. 5

Meriam Webster Dictionary 2022 .................................................................................. 8

Plaintiffs, by and through Counsel, provide this Memorandum in Support of their Motion for Preliminary Injunction.

## FACTS

**The CDC's Mask Mandate**

On January 29, 2021, Defendant Sherri A. Berger ("**Defendant Berger**"), in her capacity as Chief of Staff of the Centers for Disease Control ("**CDC**"), issued the mandate at issue (the "**Mask Mandate**"), and it became effective on February 3, 2021.  *See* 86 Fed. Reg. 8025, 8026 (Feb. 3, 2021).  For more than a year, Americans have been told that this measure was temporary, enacted to deal with a surge in COVID-19, and, like Lucy pulling away the football in Charlie Brown, in every instance that the Americans were told that the mandate would expire and be repealed, it has been kept in place and extended.  Most recently, this occurred on March 10, 2022.[1] The Mask Mandate requires persons who are "boarding, disembarking, and traveling" through a "transportation hub" or on "conveyances" into and within the United States to wear a mask over their nose and mouth.  *Id.* at 8029.  The Mask Mandate defines the terms "mask," "conveyance," and "transportation hub" as follows:

- A "mask" is defined as "a material covering the nose and mouth of the wearer, excluding face shields."  *Id.* at 8026.

- A "conveyance" is defined as "an aircraft, train, road vehicle, vessel . . . or other means of transport, including military," and includes rideshare arrangements.  *Id.* at 8027.

- A "transportation hub" is defined as "any airport, bus terminal, marina, seaport or other port, subway station, terminal (including any fixed facility at which passengers are picked-

---

[1]  The TSA Security Directive implements, and relies upon, the CDC Order. https://www.tsa.gov/news/press/statements/2022/03/10/statement-regarding-face-mask-use-public-transportation (last visited 3/15/2022).

up or discharged), train station, U.S. port of entry, or any other location that provides transportation subject to the jurisdiction of the United States." *Id.*

The Mask Mandate applies to all travelers, irrespective of whether they have been exposed to COVID-19. It permits everyone, including healthy people and people who may or may not have been exposed to COVID-19, to not wear a mask when eating, drinking, or taking medication "for brief periods," when wearing of oxygen masks on airplanes is required, or when unconscious or incapacitated. *Id.* at 8027.

The Order requires conveyance operators and transportation hub operators to enforce the Mask Mandate. *Id.* at 8026. The Mask Mandate states that "[m]asks help prevent people who have COVID-19, including those who are pre-symptomatic or asymptomatic, from spreading the virus to others," but provides no findings that show masks have limited the interstate spread of COVID-19 through conveyances and transportation hubs. *Id.* at 8028. Violating the Mask Mandate carries criminal penalties. *Id.* at 8030 n.33.

The Mask Mandate states that it was not subject to notice and comment and a delay in the effective date because "good cause" existed to forgo these basic procedural safeguards, yet the Mask Mandate remains in effect 13 months later, still without any notice or comment. *Id.* at 8030.

## The Members' Standing and Damages

The Members frequently travel via commercial airlines subject to the Mask Mandate, each taking numerous flights per year, including flights that originate or arrive in the Western District of Kentucky. Members are required to wear a mask on each of these flights and while traveling through airports throughout the United States because of the Mask Mandate, except, of course, when they are, *inter alia*, eating or drinking "for brief periods."

Members object to wearing a mask and would not wear a mask if the Mask Mandate did

not exist.  Furthermore, the requirement to wear a mask pursuant to the Mask Mandate requires the Members to purchase masks, causing them ongoing financial harm in the form of out-of-pocket expenditures for the purchase and use of each mask.  To be clear, Members do support the right of individuals to make their own decisions as to whether to continue to wear a mask.

## LAW AND ARGUMENT

### A.  Legal Standard

When ruling on a motion for preliminary injunction, the court must consider the following four factors: (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm; (3) whether issuance would cause substantial harm to others; and (4) whether the public interest would be served by issuance.  *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).   These "are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  Further, the movant "is not required to prove his case in full at a preliminary injunction hearing*." Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

### B.  The Members Are Likely to Succeed on the Merits

The Members can demonstrate a strong likelihood of success on the merits in this case for the two following reasons: (1) none of the statutes or regulations cited by the CDC for the authority to adopt this regulation – 42 U.S.C. § 264, 42 C.F.R. §§ 70.2 (the regulation implementing § 264), 71.31(b), and 71.32(b) – permit the CDC to implement or enforce the Mask Mandate; and (2) even assuming *arguendo* that Congress had granted the CDC the authority to promulgate the Mask

Mandate (which it did not), this authority would, absent a clear directive from Congress, violate the nondelegation doctrine based on the statute at issue.

### 1. The CDC lacks any statutory authority to adopt the Mask Mandate

The CDC bases its authority to adopt and enforce the Mask Mandate on Section 264 of Title 42. 86 Fed. Reg. at 8029. But the Mask Mandate clearly exceeds the cited statutory authority. Where an agency action lacks statutory authority, the court must hold such action as unlawful and set it aside. 5 U.S.C. § 706(2)(c). The relevant subsection of Section 264 reads as follows:

> **(a) Promulgation and enforcement by Surgeon General.**[2] The Surgeon General, with the approval of the [Secretary], is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

42 U.S.C. § 264(a).

Traditional methods of construction indicate that Section 264(a) provides no authority for the Mask Mandate. First, we look to the plain language of Subsection (a) of Section 264, which has already been interpreted by the Supreme Court in *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021). While Defendants will certainly claim that "the first sentence of [Section 264(a)] gives the CDC broad authority to take whatever measures it deems necessary to control the spread of COVID-19," the second sentence severely limits such authority "by illustrating the kinds of

---

[2] The statutory powers granted to the Surgeon General were transferred to the Secretary of the Department of Health and Human Services. *See* 20 U.S.C. § 3508; 31 Fed. Reg. 8855 (June 25, 1966).

measures that could be necessary: inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of contaminated animals and articles." *Id.* at 2488; *see also Tiger Lily, LLC v. United States HUD*, 5 F.4th 666, 671 (6th Cir. 2021) ("*Tiger Lily*") ("Therefore, we conclude that the first sentence of § 264(a) authorizes the Secretary to take action and the second dictates what actions he may take."); *Florida v. Becerra*, 2021 WL 2514138, 2021 U.S. Dist. LEXIS 114297, at *59 (M.D. Fla. June 18, 2021) ("In short, several canons of statutory interpretation—such as *ejusdem generis*, *noscitur a sociis*, the canon against surplusage, the constitutional avoidance canon, and the major questions doctrine—gravitate against CDC's broad interpretation [of § 264(a)].") Thus, the Mask Mandate clearly falls outside the specific measures authorized by Section 264(a).

Additionally, Section 264(a) includes a catchall provision allowing the CDC to take "other measures, as in his judgment may be necessary."  But traditional methods of statutory interpretation indicate that this catchall provision is quite limited.  First, the interpretive doctrines of *ejusdem generis* and *noscitur a sociis* limit the power conferred by the catchall phrase to measures that are similar to the ones listed.  *See Canton Police Benevolent Ass'n of Canton v. United States*, 844 F.2d 1231, 1236 (6th Cir. 1988) (Under the doctrine of *ejusdem generis*, "a general word in a statute takes its character from the specific words with which it appears."); *see also Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) (Under the doctrine of *noscitur a sociis*, "the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it.") (citing Black's Law Dictionary, 1060 (6th ed. 1990)).  Indeed, the Supreme Court came to the same conclusion when it stated that the second sentence of Section 264(a) illustrates the "kinds of measures that could be necessary." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488.  The authorized acts

are strictly limited to those that concern "identifying, isolating and destroying the disease itself." *Id.*

Additionally, the Sixth Circuit already examined the catchall provision of Section 264(a) in *Tiger Lily* and similarly concluded that it was quite limited.  In *Tiger Lily*, the government argued that the catchall provision of Section 264(a) provided ample authority for the CDC's eviction moratorium.  However, the Sixth Circuit rejected this argument and determined that the CDC's authority under this statue was limited to only the specific actions listed or to those that are similar.  *Tiger Lily*, 5 F.4th at 671 ("[T]he residual phrase in the second sentence of § 264(a) – which allows the Secretary to take 'other measures' he deems necessary to stop the spread of disease – encompasses measures that are similar to inspection, fumigation, destruction of animals, and the like.").  The *Tiger Lily* Court, without directly saying it, applied the concepts of *ejusdem generis* and *noscitur a sociis* to arrive at this conclusion.  *Tiger Lily*, 5 F. 4th at 670-71 ("Read in conjunction with the first sentence, the second lists how the Secretary might enforce the regulations that are, in his judgment, 'necessary to prevent the introduction, transmission, or spread of communicable diseases.'  Plainly, the second sentence narrows the scope of the first." (internal citations omitted)).

The *Tiger Lily* Court also relied on two additional doctrines of construction as limiting the reach of the catchall provision: (1) the rule against surplusage[3] and (2) the doctrine of constitutional avoidance.[4]  First, the Court found that the government's reading of the catchall

---

[3] The rule against surplusage "reflects the idea that every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."  *Donovan v. Firstcredit, Inc.*, 983 F.3d 246, 257 (6th Cir. 2020) (internal quotations omitted) (citing *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019)).

[4] The doctrine of constitutional avoidance dictates that courts must avoid an interpretation of a statute "that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 864 (1989).

6

provision as an expansion of power "reduces the other provisions in § 264 to mere surplusage." The Court reasoned that, if the Secretary really had the power "to impose any regulation he thought 'necessary to prevent the introduction, transmission, or spread of communicable diseases,' there would be no need to specifically authorize the apprehension and detention of infected individuals in Section 264(d), or the inspection and fumigation of contaminated properties in Section 264(a). Those specific grants of power would be superfluous." *Id.* at 671. Second, the Court reasoned that the government's interpretation would raise constitutional problems like the nondelegation doctrine, as discussed further below, and "courts 'should never . . . construe an Act in a sense which would render it unconstitutional if a different and permissible construction will save it.'" *Id.* at 671-72.

Here, the Mask Mandate is nothing like the authorized actions that precede the catchall provision – inspection, fumigation, disinfection, sanitation, pest extermination, destruction of contaminated animals or articles. The Mask Mandate is different because it does not relate to "identifying, isolating and destroying the disease itself." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488. Unlike the previously listed actions, the Mask Mandate does not directly target the disease, but instead is a sweeping decree that extends to all individuals whether they are infected or not. Indeed, in most cases, the Mask Mandate imposes its requirements where the disease is not present at all.

Looking at each measure that is authorized by Section 264(a) makes clear that face coverings are not authorized by it. For instance, Section 264(a) first permits "inspection" measures – that is, measures to detect the disease. But wearing a mask is not a test for COVID-19 and thus is clearly not akin to an inspection measure. Next, Section 264(a) permits "fumigation" measures. By its dictionary definition, which are "to apply smoke, vapor, or gas to especially for the purpose

of disinfecting or of destroying pests," such measures permit the introduction or requirement to introduce chemicals to kill a disease. (Meriam Webster Dictionary 2022). But, again, wearing a face mask is not akin to adding chemicals to control disease or pests.

Further, Section 264(a) permits "disinfection" measures. Disinfection is "the process of using a disinfectant to destroy, inactivate, or significantly reduce the concentration of pathogenic agents (such as bacteria, viruses, and fungi)." (Meriam Webster Dictionary 2022). Again, forcing people to wear face coverings is not applying a disinfectant (a chemical agent), to destroy the virus.

Further, Section 264(a) permits "sanitation" measures. Sanitation is "the promotion of hygiene and prevention of disease by maintenance of sanitary conditions (as by removal of sewage and trash) —often used attributively." (Meriam Webster Dictionary, 2022). The CDC defines sanitation as "having access to facilities for the safe disposal of human waste (feces and urine), as well as having the ability to maintain hygienic conditions, through services such as garbage collection, industrial/hazardous waste management, and wastewater treatment and disposal." https://www.cdc.gov/healthywater/global/sanitation/index.html (last visited 3/16/2022). But, again, the Mask Mandate does not require cleaning or removal of sewage or trash. Consequently, this clause does not apply.

Next, Section 264(a) permits "pest extermination," but masks do not exterminate pests. And, finally, masks do not destroy animals or articles, as Section 264(a) permits.

The meaning and import of Section 264 was expounded upon, and its historical roots examined in *Florida*, 544 F. Supp. 3d 1241. There, as here, a federal court had occasion to examine the historical pedigree and meaning of Section 264. "In other words, Section 264(a) allows the regulation of only an infected or infecting item." *Id.* (quoting *Ala. Ass'n of Realtors v. United States HHS*, 2021 U.S. Dist. LEXIS 85568, 2021 WL 1779282, at *5 (D.D.C. 2021) ("[A]ny

regulations enacted pursuant to § 264(a) must be directed toward specific targets 'found' to be sources of infection."")).  Further, an expansive interpretation of Section 264(a) here runs headlong into the interpretive principle that when an "administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power," there must be "a clear indication that Congress intended that result."  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001).  Certainly, and traditionally, inspection and disinfection of arriving vessels was delegated to the federal government.  *Florida*, 544 F. Supp. 3d 1241.  But a federal mandate requiring persons on vessels, as a measure to control disease, to don a facemask has *never* been required before.

Congress could arguably adopt a facemask requirement on aircraft, trains, and other vessels engaged in the channels of interstate commerce.  But the question here is whether Congress did *in fact* authorize the CDC to adopt one.  And Section 264(a)'s first sentence –however, capacious it might appear on its face – no more qualifies as a "clear statement" of Congress's intent to do so than the "extremely broad[]" definition of "[c]hemical weapon" in *Bond v. United States*, 572 U.S. 844, 860 (2014).

And because *any* activity involving human interaction threatens "the introduction, transmission, or spread of communicable diseases," 42 U.S.C. § 264(a), there would be no area of common life or sector of the economy left outside the CDC's control.  *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007) (noting "a 'strong consensus' that global warming threatens … an increase in the spread of disease").

This expansive interpretation of the CDC's power would render the specifically listed items under Section 264 mere surplusage.  Further, if the CDC's authority was limited only by its own discretion as to what is "necessary," there are no meaningful constraints on its authority and the

statute runs afoul of the nondelegation doctrine.  All of the controlling case law and the doctrines of construction examined therein point to the fact that Section 264(a) unambiguously limits the power of the CDC, and that the Mask Mandate clearly exceeds those powers and should be set aside.

### 2.  The regulations at issue do not authorize the action taken either

The CDC also cites 42 C.F.R. §§ 70.2, 71.31(b), and 71.32(b) as its authority for the Mask Mandate.  Like the statute, 42 C.F.R. § 70.2 also contains the same list that Section 264(a) does ("including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection."), and, like the statute and for the same reason that Section 264(a) does not permit a mask mandate, this regulation also does not permit a mask mandate; further, the regulation section is only applicable when there is a determination made that "the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession."

Next, 42 C.F.R. § 71.31(b) provides, "The Director may require detention of a carrier until the completion of the measures outlined in this part that are necessary to prevent the introduction or spread of a communicable disease.  The Director may issue a controlled free pratique to the carrier stipulating what measures are to be met, but such issuance does not prevent the periodic boarding of a carrier and the inspection of persons and records to verify that the conditions have been met for granting the pratique."  The "measures" that are to be met refers back to the measures "outlined in this part," and are not, as Defendants may suggest, anything the CDC specifies. Further, 42 C.F.R. § 71.31(b) is expounded upon by 42 C.F.R. § 71.31(a), which explains that the entire provision is only applicable to carriers arriving at the United States from foreign countries,

10

not carriers that travel from state to state, i.e., carriers that "present a threat of introduction of communicable diseases into the United States."

Finally, 42 C.F.R. § 71.32(b) provides that whenever the Director has reason to believe that "any arriving carrier or article or thing on board the carrier is or may be infected or contaminated with a communicable disease," "he/she may require detention, disinfection, disinfestation, fumigation, or other related measures respecting the carrier or article or thing as he/she considers necessary to prevent the introduction, transmission, or spread of communicable diseases." Again, we do not deal here with detention, disinfection, disinfestation, or fumigation, and mask wearing is not related to those measures.

Moreover, 42 C.F.R. § 71.32(a) explains what diseases are applicable to the regulation, and COVID-19 is not among them:

> (a) Whenever the Director has reason to believe that any arriving person is infected with or has been exposed to any of the communicable diseases listed in an Executive Order, as provided under section 361(b) of the Public Health Service Act, he/she may isolate, quarantine, or place the person under surveillance and may order disinfection or disinfestation, fumigation, as he/she considers necessary to prevent the introduction, transmission or spread of the listed communicable diseases. Executive Order 13295, of April 4, 2003, as provided under section 361 of the Public Health Service Act (42 U.S.C. 264), and as amended by Executive Order 13375 of April 1, 2005, contains the current revised list of quarantinable communicable diseases, and may be obtained at http://www.cdc.gov and http://www.archives.gov/federal- register. If this Order is amended, HHS will enforce that amended order immediately and update this reference.

In short, the regulations cited by the CDC as its authority do not authorize a mask mandate.

**3.   Any authority granted to the CDC from Congress violates the Nondelegation Doctrine and raises issues under the Major Questions Doctrine**

Even assuming arguendo that Congress had granted the CDC the authority to promulgate

the Mask Mandate (which it did not), this authority would violate the nondelegation doctrine. Article I, Section I of the U.S. Constitution states: "All legislative powers herein granted shall be vested in a Congress of the United States."  Beyond exceeding the authority granted to the CDC under 42 U.S.C. § 264 and the relevant regulations, the Mask Mandate also constitutes an unconstitutional delegation of legislative power to the CDC.

To comply with the nondelegation doctrine, a statute must delineate: (1) a general policy; (2) the agency to apply it; and (3) the boundaries of the delegated authority.  *See Mistretta v. United States*, 488 U.S. 361, 372-73 (1989).  The boundaries of the delegated authority must meaningfully constrain the Executive Branch's discretion.

If 42 U.S.C. § 264 could, in fact, be read to authorize the CDC to implement the Mask Mandate (which is not the case), it does not provide adequate boundaries that meaningfully constrain the agency's authority.  Giving Section 264(a) a broad and untethered grant of authority, as the Government suggests, grants the Secretary legislative authority by giving him the power to "make and enforce" regulations without providing any meaningful boundaries.  The only "boundary" is what "in his judgment are necessary", which is not a meaningful constraint. 42 U.S.C. § 264.  Accordingly, it violates the nondelegation doctrine.  Members allege that both on its face and as applied, the Mask Mandate violates their constitutional rights.

Under the Major Questions Doctrine, for an "agency to exercise regulatory authority over a major policy question of great economic and political importance, Congress must … expressly and specifically delegate to the agency the authority both to decide the major policy question and to regulate and enforce." *Paul v. United States*, 140 S. Ct. 342 (2019).  There is, to be certain, a delegation to the CDC of certain control measures when it comes to communicable disease.  But those measures are limited to "inspection, fumigation, disinfection, sanitation, pest extermination,

destruction of animals or articles found to be so infected" and measures that are like the foregoing. 42 U.S.C. § 264(a).  There has been no delegation for a general mask mandate.  There can be no dispute that the decision whether to criminalize the failure to wear a mask on airplanes, at airports, buses, and trains throughout the country constitutes "a major policy question of great economic and political importance."  *Id.*  As further evidence of the scope of the policy at issue, even the CDC acknowledged that "if this Order were a rule, it would be a major rule under the Congressional Review Act" and is "an economically significant regulatory action under Executive Order 12866."  86 FR 8025.  This means that it will have "an annual effect on the economy of $100,000,000 or more," 5 U.S.C. § 804(2).

In short, under the CDC's reading of Section 264(a), both "the degree of agency discretion" and "the scope of the power congressionally conferred" are practically limitless, even though the two should be inversely correlated.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001).  By any measure, that is an unconstitutional delegation.  To applicants' knowledge, this Court has never suggested that Congress could give an executive officer authority to criminalize any conduct bearing on human interaction based solely on "his judgment" that doing so is "necessary" to prevent the spread of any communicable disease.  42 U.S.C. § 264(a); *cf. Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion) (acknowledging that if a statute gave "'plenary power'" to an executive officer to determine a criminal law's applicability to particular offenders, it would pose "a nondelegation question").  Such a statute would not "authorize another branch to 'fill up the details,'" it would not ask for "executive fact-finding," and it would not assign executive officers "certain non-legislative responsibilities."  *Gundy*, 139 S. Ct. at 2136-37 (Gorsuch, J., dissenting).  It would, however, constitute a "congressional delegation[] to agencies of authority to decide major policy questions."  *Paul*,

140 S. Ct. 342.   There is no reason "to assume that Congress intended to give" the CDC such "unprecedented power," *Industrial Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645-46 (1980) (plurality opinion).

### C. Members Will Suffer Irreparable Harm in the Absence of the Preliminary Injunction

If an injunction is not granted, the Members will suffer an irreparable harm.  Every time a Member is subject to the Mask Mandate, he or she must use a mask that was purchased at the Members' own expense.  These costs are not recoverable as the Members are barred by sovereign immunity from collecting money damages from the CDC.  Aside from having to comply with this unlawful restriction on travel, even by the CDC's conservative estimates, this measure will and has had an impact of at least a $100 million. *See supra* p. 16.  By any metric, that is a substantial injury.

"Normally the mere payment of money is not considered irreparable, but that is because money can usually be recovered from the person to whom it is paid.  If expenditures cannot be recouped, the resulting loss may be irreparable."  *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers) (internal citation omitted).  Thus, if "it appears that" the "[f]unds … will not likely be recoverable," that is enough to establish irreparable injury.  *Id.* at 1304-05; *see Mori v. Int'l Bhd. of Boilermakers*, 454 U.S. 1301, 1303 (1981) (Rehnquist, J., in chambers) ("The funds held in escrow … would be very difficult to recover should applicants' stay not be granted.").  It is quite unlikely that Members will ever be made whole.  *See, also, Nat'l Fed'n of Indep. Bus. v. DOL*, *OSHA*, 142 S. Ct. 661 (2022) (staying OSHA vaccine mandate, in part, on the grounds that the losses and compliance costs in caused could not be recovered).

The Administrative Procedure Act does not allow applicants to collect "money damages," 5 U.S.C. § 702.  Accordingly, here, as elsewhere, "complying with a regulation later held invalid

14

almost always produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in the judgment); *see, e.g., Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929) (holding that a company would suffer an irreparable injury from paying allegedly unconstitutional tax because state law provided "no remedy whereby restitution of the money so paid may be enforced").

Further, "[t]he loss of constitutional freedoms 'for even minimal periods of time . . . unquestionably constitutes irreparable injury.'" *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This is true whether the alleged constitutional violation is an individual right or a structural provision. *NLRB v. Canning*, 573 U.S. 513, 570 (2014) (Scalia, J., concurring) ("[T]he Constitution's core, government-structuring provisions are no less critical to preserving liberty than are the later adopted provisions of the Bill of Rights."). Indeed, "[s]o convinced were the Framers that liberty of the person inheres in structure that at first they did not consider a Bill of Rights necessary." *Clinton v. City of New York*, 524 U. S. 417, 450 (1998) (Kennedy, J., concurring). Those structural provisions reflect the founding generation's deep conviction that "checks and balances were the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U. S. 714, 722 (1986). It is for that reason that "the claims of individuals—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances." *Bond v. United States*, 564 U. S. 211, 222 (2011). Again, the Supreme Court suggested in *DOL*, *OSHA*, 142 S. Ct. 661, that these structural aggrandizements by the executive warranted enjoining the challenged regulation. So too here.

### D. No Other Party Would Be Harmed by an Injunction and the Public Interest Would Be Served

Should the Court grant the preliminary injunction, it would not cause substantial harm to others. The CDC has lifted other mask-related guidance, including for indoor public spaces and

schools in certain areas.  Every person is still free to wear one or more masks on convenances and in transportation hubs.

Moreover, case law is clear that harm to others and the public interest collapse when the Government is violating the law – in other words, the inquiry follows the legality of the Government action.  *Vitolo v. Guzman*, 999 F.3d 353, 365 (6th Cir. 2021); *Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

### E.  <u>Scope of the Requested Preliminary Injunction</u>

Members hail from, and represent 13 states (Alabama, Arizona, Colorado, Florida, Georgia, Kentucky, Montana, North Carolina, Ohio, South Carolina, Texas, Virginia, and West Virginia).  (Pl.'s Ver. Compl., ¶5).  They frequently travel via commercial airlines subject to the Mask Mandate.  (*Id.* at 15).  Because of the nature, scope, and breadth of the flights they take, the only way to afford them relief, is to issue a nationwide injunction against the mandate.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). Universal injunctions against federal agency action are appropriate when "the public interest would be ill-served . . . by requiring simultaneous litigation of this narrow question of law in countless jurisdictions." *City of Chicago v. Sessions*, 888 F.3d 272, 292 (7th Cir. 2018).

A violation of the separation of powers supports a nationwide injunction. *City of Chicago*

*v. Barr*, 961 F.3d 882, 919 (7th Cir. 2020) ("The nature of the injury is a valid consideration in determining the proper scope of injunctive relief. … [T]he executive's usurpation of the legislature's power … implicates an interest that is fundamental to our government and essential to the protection against tyranny."). That is exactly the case here, where an agency is either exceeding its Congressionally conferred authority or exercising discretion that should have never been delegated to it. *See also Mistretta v. United States*, 488 U.S. 361, 371 (1989).

## <u>CONCLUSION</u>

Plaintiffs seek a preliminary injunction as prayed for.

Dated: March 23, 2022          **SIRI & GLIMSTAD LLP**

Aaron Siri (Pro Hac Vice)
Elizabeth A. Brehm (Pro Hac Vice)
Catherine Cline (Pro Hac Vice)
200 Park Avenue, 17th Floor
New York, New York 10166
Tel: (212) 532-1091
aaron@sirillp.com
ebrehm@sirillp.com
ccline@sirillp.com

Ursula Smith (Pro Hac Vice)
100 Congress Avenue, Suite 2000-4590
Austin, Texas 78701
Tel: (512) 265-5622
usmith@sirillp.com

**Chris Wiest, Attorney at Law, PLLC**

   */s/ Christopher Wiest*
Christopher Wiest (KBA #90725)
Chris Wiest, Attorney at Law, PLLC
25 Town Center Blvd, Ste. 104
Crestview Hills, Kentucky 41017
Tel: (513) 257-1895
chris@cwiestlaw.com

*Attorneys for Members*

17

## **CERTIFICATE OF SERVICE**

I certify that I have served a copy of the foregoing upon each Defendant at their addresses (and the United States by service upon the U.S. Attorney and U.S. Attorney General), by priority U.S. mail, as well by CM/ECF, this 23 day of March, 2022.

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)

18