# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF KENTUCKY (Bowling Green Division)

HONORABLE THOMAS MASSIE,
HONORABLE RAND PAUL, HONORABLE
ANDY BIGGS, HONORABLE DAN BISHOP,
HONORABLE LAUREN BOEBERT,
HONORABLE ANDREW CLYDE,
HONORABLE WARREN DAVIDSON,
HONORABLE BOB GOOD, HONORABLE
PAUL GOSAR, HONORABLE MARJORIE
TAYLOR GREENE, HONORABLE BRIAN
MAST, HONORABLE ALEX MOONEY,
HONORABLE BARRY MOORE, HONORABLE
RALPH NORMAN, HONORABLE BILL POSEY,
HONORABLE MATT ROSENDALE, and
HONORABLE CHIP ROY,

Civil Action No.
1:22-cv-0031-BNB-HBB

                           Plaintiffs,

       -against-

CENTERS FOR DISEASE CONTROL AND
PREVENTION; ROCHELLE P. WALENSKY in
her official capacity as Director of Centers for
Disease Control and Prevention; and SHERRI A.
BERGER in her official capacity as Chief of Staff
of Centers for Disease Control and Prevention,

                           Defendants.

## NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs, by and through Counsel, hereby provide this Notice of Supplemental Authority

in support of their Motion for Preliminary Injunction, (Doc. 18).  On April 18, 2022, the United

States District Court for the Middle District of Florida, Tampa Division, issued an Order granting

summary judgment in favor of the plaintiffs, on the same grounds implicated in this matter,

declaring unlawful and vacating the Federal Mask Mandate, and remanding the matter to the CDC

for further proceedings.  *Health Freedom Defense Fund, Inc. v. Biden*, No. 8:21-cv-1693-KKM-AEP (M.D. Fl. Apr. 18, 2022).  A copy is attached.

Dated: April 18, 2022

**SIRI & GLIMSTAD LLP**

*/s/ Aaron Siri*

Aaron Siri (Pro Hac Vice)
Elizabeth A. Brehm (Pro Hac Vice)
Catherine Cline (Pro Hac Vice)
200 Park Avenue, 17th Floor
New York, New York 10166
Tel: (212) 532-1091
aaron@sirillp.com
ebrehm@sirillp.com
ccline@sirillp.com

Ursula Smith (Pro Hac Vice)
100 Congress Avenue, Suite 2000-4590
Austin, Texas 78701
Tel: (512) 265-5622
usmith@sirillp.com

**Chris Wiest, Attorney at Law, PLLC**

Christopher Wiest (KBA #90725)
Chris Wiest, Attorney at Law, PLLC
25 Town Center Blvd, Ste. 104
Crestview Hills, Kentucky 41017
Tel: (513) 257-1895
chris@cwiestlaw.com

*Attorneys for Members*

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that I have served a copy of the foregoing upon each Defendant by this Court's CM/ECF system, this 18 day of April, 2022.

 */s/ Aaron Siri*
Aaron Siri (Pro Hac Vice)

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

HEALTH FREEDOM DEFENSE
FUND, INC., ANA CAROLINA
DAZA, and SARAH POPE,

     Plaintiffs,

v.                             Case No: 8:21-cv-1693-KKM-AEP

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States,
et al.,

     Defendants.

_____

## ORDER

     As travelers have been reminded for more than a year, federal law requires wearing a mask in airports, train stations, and other transportation hubs as well as on airplanes, buses, trains, and most other public conveyances in the United States. Failure to comply may result in civil and criminal penalties, including removal from the conveyance. This masking requirement—commonly known as the Mask Mandate—is a Centers for Disease Control and Prevention (CDC) regulation published in the Federal Register on February 3, 2021.

In July 2021, Sarah Pope, Ana Daza, and Health Freedom Defense Fund sued various government officials and the CDC, seeking a declaratory judgment that the Mask Mandate was unlawful and to have it set aside for violating the Administrative Procedure Act (APA). Following submission of the administrative record, Defendants—collectively referred to as "the government"—moved for summary judgment on January 18, 2022. (Doc. 45.) As provided in the parties' agreed briefing schedule, Plaintiffs filed a cross motion for summary judgment on February 17, 2022. (Doc. 48.) The parties completed briefing on March 31, 2022. The cross motions for summary judgment are now ripe for review. The Court concludes that the Mask Mandate exceeds the CDC's statutory authority and violates the procedures required for agency rulemaking under the APA. Accordingly, the Court vacates the Mandate and remands it to the CDC.

## I.   BACKGROUND

In December 2019, a highly contagious respiratory virus colloquially known as COVID-19 began spreading throughout the world. A month later, the Secretary of Health and Human Services declared COVID-19 a public health emergency. *See Determination That a Public Health Emergency Exists*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx   (Jan. 31, 2020). And then on March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency. *See* Declaring a National Emergency Concerning the

Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337, 15337 (Mar. 13, 2020).

COVID-19 continued to spread throughout 2020 despite experiments with "unprecedented movement restrictions and social distancing measures." (Doc. 30 at 41.) By the end of 2020, approximately twenty million Americans had been infected with COVID-19 and over 360,000 Americans had died from it. *See COVID Data Tracker*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/ (last visited Apr. 13, 2022). The fall and winter of 2020 also brought a spike in new COVID-19 infections, due in part to emerging variants of the virus, some of which were more severe than the original strain and more easily transmissible. *Id.*; (Doc. 30 at 12–15). The number of new cases peaked in early January 2021 and decreased steadily in February. *See COVID Data Tracker*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#trends_dailycases (last visited Apr. 11, 2022).

On January 21, 2021, one day after taking the oath of office, President Biden issued Executive Order 13998. *See* Promoting COVID-19 Safety in Domestic and International Travel, 86 Fed. Reg. 7205 (Jan. 21, 2021). The Executive Order recognized the threats of the continuing COVID-19 pandemic and reasoned that mask-wearing "can mitigate the risk of travelers spreading COVID-19." *Id.* at 7205. Accordingly, the Order directed

executive officials to require masks on various forms of transportation and while in transit hubs. *Id.*

Approximately two weeks later, on February 3, 2021, the CDC published the Mask Mandate without allowing public participation through the APA's notice and comment procedures. *See* Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs, 86 Fed. Reg. 8025 (Feb. 3, 2021). As the basis for dispensing with the ordinary APA requirements, the CDC found that "it would be impracticable and contrary to the public's health" to delay the Mandate to seek public comment. *Id.* at 8030. The Mandate also disavowed being a rule under the APA. *Id.*

In the Mandate, the CDC explained that COVID-19 "spreads very easily and sustainably between people who are in close contact." *Id.* at 8028. This spread occurs mainly through the transfer of "respiratory droplets" from one person to another. *Id.* Masks, the CDC found, prevent this spread by "blocking exhaled virus" and "reducing inhalation of these droplets." *Id.* Because COVID-19 can be spread by "pre-symptomatic" and "asymptomatic" individuals infected with it, *id.*, the CDC found that masks are "one of the most effective strategies available for reducing COVID-19 transmission," *id.* at 8026. The Mandate did not differentiate between kinds of masks based on their efficacy at blocking transmission. It simply included a footnote linking to CDC guidance for the "attributes of acceptable masks." *Id.* at 8027 n.6 ("Masks can be either manufactured or

homemade and should be a solid piece of material without slits, exhalation valves, or punctures.").

The Mask Mandate requires that "a person must wear a mask while boarding, disembarking, and traveling on any conveyance into or within the United States." *Id.* at 8029. The Mandate's reach extends to "aircraft[s], train[s], road vehicle[s]"—including ride-sharing services, like Uber—"vessel[s]" and "other means of transport." *Id.* at 8027. It also applies beyond conveyances to any transportation hub, which includes "any airport, bus terminal, marina, seaport or other port, subway station, terminal . . . , train station, U.S. port of entry, or any other location that provides transportation subject to the jurisdiction of the United States." *Id.* In addition to the requirement that individuals in these locations wear masks, the Mandate also enlists conveyance operators to police it. It requires operators to use "best efforts" to enforce masking. *Id.* at 8026.

Though broad in scope, the Mandate provides exceptions to limit its coverage based on the person, the conveyance, or the situation. First, the Mandate excludes children under the age of two years old and persons with a disability that prevents them from being able to safely wear a mask. *See id.* at 8027. The latter exception applies only to individuals who cannot wear a mask because of a disability that is within the scope of the Americans with Disabilities Act (ADA). *Id.* Second, it excludes "personal, non-commercial use" of vehicles and commercial vehicles occupied by a single person. *Id.* at 8028. Third, it excludes

situations where, for example, a person must wear an oxygen mask; or is actively "eating, drinking, or taking medication"; or must remove the mask to verify his identity; or to catch his breath after "feeling winded"; or to communicate with someone who is hearing impaired. *Id.* at 8027 & n.7.

Health Freedom Defense Fund, Ana Daza, and Sarah Pope (Plaintiffs) sued to challenge the Mask Mandate on July 12, 2021. (Doc. 1.) Daza and Pope routinely travel by airplane. (Doc. 48-2 at 2; Doc. 48-3 at 2.) Daza has anxiety that is aggravated by wearing masks. (Doc. 48-2 at 3.) Daza alleges that "the government does not recognize [her] anxiety as a basis for a[ medical] exemption" from the Mandate. (*Id.*) Similarly, Pope flew regularly before the pandemic, but has done so less since the CDC imposed the Mask Mandate as the "constricted breathing from wearing a mask" provokes or exacerbates her panic attacks. (Doc. 48-3 at 2–3.) Health Freedom Defense Fund is a non-profit organization that "opposes laws and regulations that force individuals to submit to the administration of medical products, procedures, and devices against their will." (Doc. 48 at 19.) Health Freedom represents the interests of its members who are subject to the Mask Mandate, at least one of whom has alleged harms sufficient to establish standing in her own right. (*Id.* at 21; Doc. 39-4 at 2–4); *see Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (explaining that an organization may sue on behalf of its members if at least one member has standing). The government "do[es] not dispute that at least

some Plaintiffs have Article III standing to challenge the CDC's transportation mask order" because it "imposes a legal obligation on the individual Plaintiffs to wear masks when using public transportation." (Doc. 45 at 44.)

Seeking a declaratory judgment that the Mask Mandate is unlawful and to have it set aside under the APA, Plaintiffs sued President Joseph Biden, Secretary of Health and Human Services Xavier Becerra, CDC Director Rochelle Walensky, and Director of the CDC's Division of Global Migration and Quarantine Martin Cetron, all in their official capacities. Plaintiffs also sued the CDC and the United States of America.

## II.   LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it could change the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if a reasonable finder of fact could conclude for the nonmoving party. *Id.*

The APA requires that reviewing courts "hold unlawful and set aside agency action" that is "arbitrary" or "capricious"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or that was issued "without observance of procedure required by law." 5 U.S.C. § 706. In a case reviewing agency action, "[t]he 'entire case' on review is a question of law" and "the district judge sits as an appellate tribunal." *Am.*

*Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (Silberman, J.). "Summary judgment serves as 'the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *O.A. v. Trump*, 404 F. Supp. 3d 109, 125 (D.D.C. 2019) (quotation omitted). If a plaintiff "prevails on its APA claim," the "relief under that statute normally will be a vacatur of the agency's order." *Am. Bioscience*, 269 F.3d at 1084.

## III.   ANALYSIS

Plaintiffs' Amended Complaint challenges the CDC's Mask Mandate on several grounds. (Doc. 39.) It alleges that the Mandate exceeds the CDC's statutory authority (Count I). In the alternative it alleges that, if the Mandate is statutorily authorized, Congress improperly delegated its legislative power to the CDC (Count IV). The Amended Complaint further alleges that the CDC improperly invoked the good cause exception to avoid the notice and comment procedures required under the APA (Count II). Finally, it alleges that the Mandate violates the APA because it is arbitrary and capricious (Count III).

Although Plaintiffs initially challenged the lawfulness of President Biden's January 21, 2021 Executive Order in Counts V and VI, they withdrew these claims in their motion for summary judgment. (Doc. 48 at 11 n.1.) With that withdrawal, President Biden is due to be terminated as a Defendant to this action. (Doc. 45 at 47 n.13.)

The Court proceeds to discuss Plaintiffs' remaining claims.

## A. The Mask Mandate Exceeds the CDC's Authority under the Public Health Services Act

Because "[a]dministrative agencies are creatures of statute," they "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 665 (2022) (per curiam). In issuing the Mask Mandate that requires most "persons to wear masks over the mouth and nose when traveling on any conveyance . . . into or within the United States," 86 Fed. Reg. at 8026, the Director of the CDC relied on a section of the Public Health Services Act of 1944 (PHSA) for authority, *see* 42 U.S.C. § 264(a); *see also* 42 C.F.R. 70.2 (delegating regulatory authority under this statute to the CDC). That provision empowers him to promulgate regulations aimed at "identifying, isolating, and destroying" diseases, *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2488 (2021) (per curiam):

> The [CDC], with the approval of the [Secretary of Health and Human Services], is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the [CDC] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

§ 264(a).

Other sections of the PHSA also provide the CDC with a limited power to apprehend, detain, examine, or provide conditions for the release of individuals "coming into a State or possession from a foreign country" or traveling between States but only when the CDC "reasonably believe[s]" that the person is "infected with a communicable disease" and is a "probable source of infection" to others. § 264(b)–(d). In that latter situation, the CDC may detain the individual "if upon examination" he is "found to be infected." § 264(d)(1).

Since Congress enacted it in 1944, the PHSA has "generally been limited to quarantining infected individuals and prohibiting the import or sale of animals known to transmit disease." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2487. It "has been rarely invoked." *Id.* At least until recently. Within the past two years, the CDC has found within § 264(a) the power to shut down the cruise ship industry, stop landlords from evicting tenants who have not paid their rent, and require that persons using public conveyances wear masks. Courts have concluded that the first two of these measures exceeded the CDC's statutory authority under § 264. *See id.* at 2488–89 (explaining that the eviction moratorium likely exceeded the scope of § 264(a)); *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1272 (M.D. Fla. 2021) (Merryday, J.) (reasoning that the CDC's conditional sail order exceeded the CDC's statutory authority under § 264(a)). No court has yet ruled on the legality of the third. At first blush, it appears more closely related to the powers granted in § 264(a) than

either the sail order or the eviction moratorium. But after rigorous statutory analysis, the Court concludes that § 264(a) does not authorize the CDC to issue the Mask Mandate.

As always when "determining the meaning of a statutory provision," the Court "look[s] first to its language, giving the words used their ordinary meaning." *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 603 (2018) (quotation omitted). The opening sentence of § 264(a) grants the CDC power to issue regulations that "in [its] judgment are necessary" to prevent the spread of communicable disease. The second sentence "informs the grant of authority by illustrating the kinds of measures that could be necessary: inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of contaminated animals and articles." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488. In other words, "the second sentence narrows the scope of the first." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.* (*Tiger Lily II*), 5 F.4th 666, 670 (6th Cir. 2021).

Thus, if § 264(a) authorizes the Mask Mandate, the power to do so must be found in one of the actions enumerated in the second sentence. *See id.* at 671 (reaching the same conclusion as to the eviction moratorium); *accord Becerra*, 544 F. Supp. 3d at 1268. That sentence provides for "inspection, fumigation, disinfection, sanitation, pest extermination, destruction . . . and other measures." § 264(a). A requirement that individual travelers wear a mask is not inspection, fumigation, disinfection, destruction, or pest extermination, and the government does not contend otherwise. (Doc. 50 at 7.) Instead, it argues that the

Mask Mandate is a "sanitation" measure or an "other measure" akin to sanitation. *See Tiger Lily II*, 5 F.4th at 671 (explaining that the residual clause "other measure" "encompasses measures that are similar to inspection, fumigation, destruction of animals, and the like"); *see also Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (explaining that a residual clause is "controlled and defined by reference to the enumerated categories . . . which are recited just before it"). Plaintiffs disagree, arguing that a mask requirement is outside the scope of sanitation. (Doc. 48 at 25.)

The PHSA does not define "sanitation." If "a term goes undefined in a statute, [courts] give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Courts often start with dictionaries. Given that the statute was enacted in 1944, the Court looks to dictionaries from the early and mid-20th century to begin its analysis. They provide two senses of sanitation that are relevant here. First, sanitation may refer to measures that clean something or that remove filth, such as trash collection, washing with soap, incineration, or plumbing. *See* WEBSTER'S NEW INT'L DICTIONARY 2214 (William Allan Neilson et al. eds., 2d ed. 1942) (defining "sanitation" to include "rendering sanitary"); FUNK & WAGNALLS, NEW STANDARD DICTIONARY 2172 (Isaac K. Funk, et al. eds., 1946) (defining "sanitation" as "the removal or neutralization of elements injurious to health"). Second, sanitation may refer to measures that keep something clean. *See* FUNK & WAGNALLS, *supra* at 2172 (the "devising and applying of

12

measures for preserving and promoting public health"); BERNARD S. MALOY, THE SIMPLIFIED MEDICAL DICTIONARY FOR LAWYERS (2d ed. 1951) ("The use of sanitary measures to preserve health."). Examples of this sense of sanitation include air filters or barriers, masks, gowns, or other personal protective equipment.[1]

Put simply, sanitation as used in the PHSA could have referred to active measures to cleanse something *or* to preserve the cleanliness of something. While the latter definition would appear to cover the Mask Mandate, the former definition would preclude it. Accordingly, the Court must determine which of the two senses is the best reading of the statute. *See Calderon v. Witvoet*, 999 F.2d 1101, 1104 (7th Cir. 1993) (Easterbrook, J.) (explaining that "one word may take multiple meanings," and that choosing between definitions "depends on context"); *Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1307–08 (11th Cir. 2021) (selecting from among definitions based on statutory context).

To aid in this statutory interpretation inquiry, dictionaries provide only a helpful starting point. *See Hi-Country Prop. Rts. Grp. v. Emmer*, 304 P.3d 851, 856 (Utah 2013) (Lee, J.) (explaining that dictionary definitions "will often fail to dictate 'what meaning a

---

[1] Some dictionaries from the time add a third sense, that of sanitation as relating to the public health. *See* FUNK & WAGNALLS, *supra* at 2172 (defining sanitation as "the practical application of sanitary science"). This third (and broadest) sense cannot be the meaning of "sanitation" in § 264(a) because it would render the other words—such as inspection, fumigation, and disinfection—superfluous. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) (noting that a proposed interpretation would violate the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute" (quotations and quotation marks omitted)). Moreover, as the Court discusses below, Congress would have spoken more clearly if it had delegated such unbounded power to the CDC. *See infra* Section III.A.3 (discussing the major questions doctrine).

word *must* bear in a particular context'" (quotation omitted)). They give the broad sweep of what a word might mean, but not what it must mean in each context. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 418 (2012) ("Because common words typically have more than one meaning, you must use the context in which a given word appears to determine its aptest, most likely sense."); *accord Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). To know which meaning Congress selected in § 264—the sense of cleaning or the sense of preserving cleanliness—the Court must rely on the statute's context, including the surrounding words, the statute's structure and history, and common usage at the time. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."). In short, the Court must consider all the traditional tools of statutory interpretation. Based on these methods, the Court concludes that the first sense— that of active cleaning—is the meaning of "sanitation" in § 264(a).

### 1. Sanitation is Limited to Cleaning Measures

Statutory construction is a search for the ordinary, contemporary meaning of terms in their context. *See Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) ("When called on to resolve a dispute over a statute's meaning, [courts] normally seek[] to afford the law's terms their ordinary meaning at the time Congress adopted them."). The context of

§ 264(a) indicates that "sanitation" and "other measures" refer to measures that clean something, not ones that keep something clean. Wearing a mask cleans nothing. At most, it traps virus droplets. But it neither "sanitizes" the person wearing the mask nor "sanitizes" the conveyance. Because the CDC required mask wearing as a measure to keep something clean—explaining that it limits the spread of COVID-19 through prevention, but never contending that it actively destroys or removes it—the Mask Mandate falls outside of § 264(a). *See* 86 Fed. Reg. at 8028 ("Masks help prevent people who have COVID-19 . . . from spreading the virus to others.").

The government would read "sanitation" and "other measures" more broadly. The government defines sanitation as "the promotion of hygiene and prevention of disease by maintenance of sanitary conditions." (Doc. 45 at 24 (quoting *Sanitation*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/sanitation).) Thus, they are using it in the second sense, that of a preventative measure. Of course, a word "may or may not extend to the outer limits of its definitional possibilities." *Dolan*, 546 U.S. at 486. Whether it does "depends upon reading the whole statutory text." *Id.* In the same way, "[w]ords that can have more than one meaning are given content . . . by their surroundings." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 466 (2001). Thus, even if the government is correct that sanitation may extend to preventative maintenance

measures, and even if masking is a "conventional 'sanitation' measure," (Doc. 45 at 24), there are four reasons to believe it does not extend so far here.

Start with the immediate context. Sanitation travels in company with "inspection, fumigation, disinfection, . . . pest extermination, [and] destruction." § 264(a). These terms involve measures aimed at "identifying, isolating, and destroying the disease itself." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488. And though "sanitation" is "susceptible of multiple and wide-ranging meanings," it is "given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). What these words have in common is that they involve identifying and eliminating known sources of disease. *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.* (*Tiger Lily I*), 992 F.3d 518, 523 (6th Cir. 2021) (summarizing subsection (a) as "government intrusions on property to sanitize and dispose of infected matter"). They do not maintain the status of being "disinfected" or "fumigated." Instead, they all change an object's status. More specifically, they involve the "direct targeting of disease," *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488, through "a discrete action," *Becerra*, 544 F. Supp. 3d at 1264.

So too, "sanitation" and "other measures" must be read in that context. *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) ("[W]ords grouped in a list should be given related meaning." (quotation omitted)). Although the government argues for a broader sense of "sanitation"—or at least the sense of sanitation that preserves a state of

cleanliness—many of its own examples involve active cleaning. (Doc. 50 at 9 (offering hand sanitizer and sanitizing wipes as examples of sanitation, both tools that *remove* pathogens and other unwanted disease).) Courts "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Thus, though "sanitation" could be defined as maintaining something in a status of good hygiene and preventing disease—as the government's definitions show—the context here suggests that is not the case. It indicates instead that "sanitation" means changing, not preserving, the status of an object or area by cleaning.

Customary usage at the time agrees. One method to assess the ordinary meaning of a term is to search a database of naturally occurring language. A search returns the desired word as well as its context and, with a sufficient sample size, search results permit inferences on how a word was used. This method is known as corpus linguistics.[2] The Court here searched the Corpus of Historical American English (COHA)[3] to find uses of "sanitation" between 1930 and 1944. Of the 507 results, the most frequent usage of sanitation fit the

---

[2] "Corpus linguistics is an empirical approach to the study of language that uses large, electronic databases" of language gathered from sources such as books, magazines, and newspapers. Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788, 828 (2018) (footnote omitted) (describing this tool).

[3] The COHA corpus is publicly available. *See* CORPUS OF HISTORICAL AMERICAN ENGLISH, https://www.english-corpora.org/coha/ (last visited Apr. 12, 2022). It is "the largest structured corpus of historical English." *Id.* Because Congress enacted the PHSA in 1944, the Court searched for uses of the word "sanitation" and variants like "sanitary" and "sanitize" between 1930 and 1944. The search returned 507 hits, or "concordance lines."

primary sense described above: a positive act to make a thing or place clean. Common examples referred to sanitation in the context of garbage disposal, sewage and plumbing, or direct cleaning of a dirty or contaminated object. In contrast, by far the least common usage—hovering around 5% of the data set—was of sanitation as a measure to maintain a status of cleanliness, or as a barrier to keep something clean. And so, the COHA search results are consistent with the contextual clues of the active words surrounding sanitation in § 264(a).

Further contextual clues support this reading. One is the implication of the government's definition on the surrounding terms. Recall that Congress listed "fumigation" and "disinfection" and "destruction" alongside "sanitation." § 264(a). If the government is correct that sanitation allows for the CDC's Mask Mandate because it promotes hygiene and prevents the spread of disease, then the remaining words in § 264(a), such as disinfection and fumigation are unnecessary. Every act necessary to prevent disease spread would be possible under sanitation. It would thus be impossible to give effect "to every clause and word of [the] statute," *Moskal v. United States*, 498 U.S. 103, 109–10 (1990), because these separate words would all be subsumed under the umbrella of "conventional 'sanitation' measure[s]," (Doc. 45 at 24). Such a reading renders most of the second sentence mere surplusage, an untenable result when other interpretations are available. *See United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else

they would not have been used."). Instead, sanitation more likely refers—consistent with its most common usage at the time—to acts that remove refuse or debris from an area or object, a reading that preserves independent meaning for the other terms in § 264(a).

The history of § 264 is another clue. As the list of actions suggest, the federal government's use of the quarantine power has been traditionally limited to localized disease elimination measures applied to individuals and objects suspected of carrying disease. *See Becerra*, 544 F. Supp. 3d at 1263–64 ("[Section 264(a)] codifies the limited regulatory power typical of preventing diseases caused by a discrete item or a person at a major port of entry."). The federal government's authority to inspect and quarantine was used to assist States, which held the primary authority to institute public health measures. *See id.* (explaining that the public health power is historically part of state police power). Though the government once conceded that § 264(a) merely "consolidates and codifies" this history, *see id.*, it now finds a power that extends far beyond it to population-wide preventative measures like near-universal mask requirements that apply even in settings with little nexus to interstate disease spread, like city buses and Ubers. Such a definition reverses the import of history as well as the roles of the States and the federal government. *See also Biden v. Missouri*, 142 S. Ct. 647, 652–53 (2022) (per curiam) (considering an agency's "longstanding litany" of comparable regulations "implementing the relevant

statutory authorities" as evidence of statutory authority). History resists reading the 1944 statute in this manner.

In sum, the context of the nearby words, the contemporary usage, the implications of the government's definition, and the history of § 264 suggest that "sanitation" and "other measures" like sanitation are far narrower than the government posits.

### 2. Sanitation is Limited to Property

There is another serious flaw to the masking–as–sanitation argument: subsection (a) does not give the CDC power to act on individuals directly. Reading the statute as a whole shows that it is divided into two parts. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))). The first part, subsection (a), gives the CDC power to directly impose on an individual's *property* interests. The second part, subsections (b)–(d), gives the CDC power to directly impose on an individual's *liberty* interests. *See Tiger Lily I*, 992 F.3d at 522, 524 (dividing the statute in this manner); *accord Tiger Lily II*, 5 F.4th at 670–71; *Skyworks v. Ctrs. for Disease Control & Prevention*, 524 F. Supp. 3d 745, 757–58 (N.D. Ohio 2021) (Calabrese, J.) (same); *Ala Ass'n of Realtors v. U.S. Dep't of Health and Hum. Servs.*, 539 F. Supp. 3d 29, 38–39, 42 (D.D.C. 2021) (Friedrich, J.) (same). Since the Mask Mandate

regulates an individual's behavior—wearing a mask—it imposes directly on liberty interests, not the property interests contemplated in subsection (a).

This reading is reinforced by three textual observations. First, the titles of subsections (b), (c), and (d) each reference persons, while the title of subsection (a) does not. *See* § 264(b) ("of individuals"); § 264(c) ("to persons"); § 264(d) ("of persons"); *see Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (explaining that a statute's titles and headings may indicate its meaning); *accord United States v. Bryant*, 996 F.3d 1243, 1258 (11th Cir. 2021) ("Titles are 'permissible indicators of meaning.'" (quotation omitted)). Far more importantly, the body of subsection (a) focuses on what the CDC may do to objects that may be dangerous to persons, while subsections (b)–(d) are addressed only to the CDC's treatment of individuals.

Second, all the examples in subsection (a)—inspection, fumigation, disinfection, sanitation, pest extermination, and destruction—are words that are not commonly used to describe what one does to a person. Instead, they are tied to "specific, tangible things on which the agency may act." *Skyworks*, 524 F. Supp. 3d at 758. The only term arguably applicable to persons is "inspection." But that would undercut any independent meaning given to "examination" in the later subsection. *See* § 264(d).

Third, the Mask Mandate is more closely related to a power discussed in subsection (b): "conditional release." § 264(b). The Mandate requires a traveler to do something to

have the privilege of passing a checkpoint and continuing on his journey. In other words, a person may travel "[s]ubject to or dependent on a condition"—namely, that he wear a mask. BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "conditional"); *see id.* (defining "release" to include the "the fact of being freed from restraint or confinement"); WEBSTER'S THIRD INT'L DICTIONARY (1976) (defining "confine" as "to prevent free outward passage or motion of"). That power is not contemplated in subsection (a). It *is* contemplated in subsection (b), which provides for "the apprehension, detention, or *conditional release* of individuals." § 264(b) (emphasis added); *see* 42 C.F.R. § 70.1 (defining "conditional release" as "temporary supervision" and "monitoring"); *see also* 42 C.F.R. § 70.5 (explaining that an individual subject to an isolation, quarantine, or conditional release order may travel if the CDC approves of the "precautions . . . taken to prevent the potential transmission or spread of [a] communicable disease").

The power to conditionally release a person bears similarity to a "provisional pratique," which allowed "a vessel to enter the port only after completing some narrow and discrete task, typically fumigation of cargo or the like." *Becerra*, 544 F. Supp. 3d at 1261 (citation omitted). Indeed, the Mandate likens itself to pratique, saying that "conveyance operators operating a conveyance arriving at or departing from a U.S. port of entry must require all persons on board to wear masks for the duration of travel as a condition of controlled free pratique." 86 Fed. Reg. at 8026. Pratiques apply to vessels and conveyances,

giving "permission for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated conditions." 42 C.F.R. § 71.1 (defining "Controlled Free Pratique"). A conditional release does the same for individuals. Both measures grant "clearance" to travel when a person or object "conform[s] to the procedures required" by public health officials. *See U.S. Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351, 367 n.2 (1971) (White, J., dissenting).

The opposite of conditional release is "detention" or "quarantine." Anyone who refuses to comply with the condition of mask wearing is—in a sense—detained or partially quarantined by exclusion from a conveyance or transportation hub under authority of the Mask Mandate. They are forcibly removed from their airplane seats, denied boarding at the bus steps, and turned away at the train station doors—all on the suspicion that they will spread a disease. Indeed, the Mask Mandate enlists local governments, airport employees, flight attendants, and even ride-sharing drivers to enforce these removal measures. In short, their freedom of movement is curtailed in a way similar to detention and quarantine. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "detention" as "confinement or compulsory delay" and "quarantine," as the "isolation of a person . . . with a communicable disease or the prevention of such a person . . . from coming into a particular area, the purpose being to prevent the spread of disease"). Neither detention nor

quarantine are contemplated in § 264(a) though—the section the CDC relied upon to issue the Mask Mandate. Instead, they are found in subsections (b)–(d).

As a result, the Mask Mandate is best understood not as sanitation, but as an exercise of the CDC's power to conditionally release individuals to travel despite concerns that they may spread a communicable disease (and to detain or partially quarantine those who refuse). But the power to conditionally release and detain is ordinarily limited to individuals entering the United States from a foreign country. *See* § 264(c). Subsection (d) allows for detention of an individual traveling between States only if he is "reasonably believed to be infected" and is actually found "upon examination" to be infected. The Mask Mandate complies with neither of these subsections. It applies to all travelers regardless of their origins or destinations and makes no attempt to sort based on their health. The CDC may not attempt to shoehorn into subsection (a) a power Congress denied it in subsections (c) and (d). As a result, the Mask Mandate exceeds the authority the statute grants the CDC.

The government disagrees, asserting that subsection (a) gives it a power to regulate persons traveling in interstate commerce. For the reasons explained above, the Court is not persuaded. Subsection (a) refers to direct impositions on property, while subsections (b)–(d) contemplate direct restrictions on individual movement. As discussed above, § 264(b)–(d) give the CDC power to directly regulate individuals only if they are traveling into the

United States from abroad or are "reasonably believed to be infected with a communicable disease in a qualifying stage." § 264(c), (d). The CDC's Mask Mandate extends to city bus terminals and ride-sharing services, not just to "individuals coming into a State or possession from a foreign country." § 264(c). And it applies to all persons in an airport, without any finding that "any individual [is] reasonably believed to be infected with [COVID-19]." § 264(d).

### 3. *Chevron* Deference

Finally, the government invokes *Chevron* deference, arguing that even if its reading of § 264(a) is not the best one, the Court should adopt it anyway. (Doc. 45 at 26–28.) *Chevron* deference requires that courts defer to an agency interpretation of a statute that the agency administers when the statute is ambiguous and the interpretation is reasonable. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984). But a court defers only if a statute is ambiguous after the court uses all the "traditional tools of statutory construction." *Id.* at 843 n.9; *see Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (explaining that "deference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent"). A court may not rest on *Chevron* to avoid rigorous statutory analysis. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("[A] court cannot wave the ambiguity flag just because it found the [statute] impenetrable on first

read."). As explained above, the statute is not ambiguous. Congress addressed whether the CDC may enact preventative measures that condition the interstate travel of an entire population on adherence to CDC dictates. It may not. So "that is the end of the matter." *Chevron*, 467 U.S. at 842.

Nor is the government's interpretation a reasonable one. *See Chevron*, 467 U.S. at 843–44 (equating "reasonable" with the question of whether "the agency's answer is based on a permissible construction of the statute"). To be reasonable, an interpretation must account for "the specific context in which [the] language is used" and "the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The government here advances a reading of "sanitation" that untethers it from the surrounding words and the statutory structure. Such an interpretation "does not merit deference." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (finding an agency interpretation unreasonable because it did not fit with the statute's design and structure). Accordingly, *Chevron* deference does not apply.

But there is an independent bar to the government's invocation of *Chevron*: the major questions doctrine. The government's interpretation is untenable because courts "expect Congress to speak clearly" if it assigns decisions "of vast economic and political significance" to an administrative agency. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489

(quotations and quotation marks omitted). The CDC asserts such a power in the Mask Mandate, but § 264(a) is far from such a grant.

The government interprets "sanitation" and "other measures" to include traditional techniques that impede the spread of disease. (Doc. 45 at 24; Doc. 50 at 7.) One definition it relies upon is even broader, defining "sanitation" as the "applying of measures for preserving and promoting public health." (*Id.* at 24 n.4 (quoting FUNK & WAGNALLS, *supra* at 2172).) If Congress intended this definition, the power bestowed on the CDC would be breathtaking. And it certainly would not be limited to modest measures of "sanitation" like masks. It would also justify requiring that businesses install air filtration systems to reduce the risks from airborne contagions or install plexiglass dividers between desks or office spaces. So too, a power to improve "sanitation" would easily extend to requiring vaccinations against COVID-19, the seasonal flu, or other diseases. Or to mandatory social distancing, coughing-into-elbows, and daily multivitamins. In short, "the sheer scope of the CDC's claimed authority under § [264(a)] would counsel against the Government's interpretation." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

But arguments about what the CDC might require in the next pandemic or COVID-19 variant are hardly necessary. The power it claims here is sufficient. The government's interpretation of § 264(a) permits the CDC to impose preventative health measures on sick and healthy individuals alike who have even attenuated connections to

interstate travel. Under this reading of § 264(a), the CDC claims a power to regulate how individuals behave in such diverse places as airplanes, train stations, marinas, and personal vehicles used in ridesharing services across town. *See* 86 Fed. Reg. at 8028. Along with the power to require that owners, operators, and employees of transit facilities use their best efforts to enforce the CDC's commands on the public. And all this with the threat of civil and criminal penalties—or at a minimum, ejection from the conveyance or transportation hub. *See id.* at 8030 n. 33.

Moreover, as the Mask Mandate acknowledged, it has a significant effect on the economy. The Mandate is a "major rule" under the Congressional Review Act, and an "economically significant regulatory action." 86 Fed. Reg. at 8030. These labels mean that the Mandate is likely to have either an annual effect of $100 million or more on the economy, a major increase in consumer prices, or significant adverse effects on the economy. *See* 5 U.S.C. § 804(2) (defining a "major rule"); Regulatory Planning and Review, Exec. Order No. 12866, 58 Fed. Reg. 51735, 51738 (Oct. 4, 1993) (defining an "economically significant regulatory action"). All told, "[t]his is no 'everyday exercise of federal power.'" *Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 665 (quoting *In re MCP No. 165*, 20 F.4th 264, 272 (6th Cir. 2021) (Sutton, C.J., dissenting from denial of initial hearing en banc)).

The government purports "to discover" this "unheralded power to regulate" how individuals appear and behave in public "in a long-extant statute"—one over seventy years old. *Util. Air Regul. Grp.*, 573 U.S. at 324. Courts greet such discoveries with "a measure of skepticism." *Id.* To date, this provision has "rarely been invoked—and never before to justify" a mandate that travelers on every form of commercialized travel wear masks. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2487 (explaining that it has "generally been limited to quarantining infected individuals and prohibiting the import or sale of animals known to transmit disease"). Perhaps the most notable use of this statute so far—excluding the last two years, of course—was a decision to ban small turtles due to a risk of salmonella. *See* Ban on Sale and Distribution of Small Turtles, 40 Fed. Reg. 22543 (May 23, 1975); *Louisiana v. Matthews*, 427 F. Supp. 174, 176 (E.D. La. 1977) (upholding the ban). And when Congress passed the statute in 1944 it did so to codify the federal government's historic role in quarantine—it was not a fount of new power. *See Becerra*, 544 F. Supp. 3d at 1263–64 ("[T]he [PHSA] codifies the limited regulatory power typical of preventing diseases caused by a discrete item or a person at a major port of entry"). This history suggests that the power the government sees in § 264(a) is a mirage.

And yet, in this statute, the CDC finds a power over public health that "was traditionally understood—and still is understood—as a function of state police power." *Id.*; *see id.* at 1262 & n.23 (collecting sources); *Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 668

(Gorsuch, J. concurring) ("Historically, [public health] matters have been regulated at the state level by authorities who enjoy broader and more general governmental powers."). Courts often decline to defer to agency interpretations that would "permit[] federal encroachment upon a traditional state power." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). That is so because it is an "ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (quotation marks and citation omitted).

Section 264(a) has no "unmistakably clear" language indicating that Congress intended for the CDC to invade the traditionally State-operated arena of population-wide, preventative public-health regulations. Or that Congress intended to "delegate a decision of such economic and political significance to an agency in so cryptic a fashion" as to tie it to "sanitation." *Brown & Williamson Tobacco*, 529 U.S. at 160 (rejecting the FDA's "extremely strained understanding of 'safety'" that supported its claim to regulate the tobacco industry).

Because it exceeded the authority granted in § 264(a), the Court must "hold unlawful and set aside" the Mask Mandate as an agency action that is "not in accordance with law," is "in excess of statutory jurisdiction, and "short of statutory right." 5 U.S.C.

§ 706. Because the Court agrees with Plaintiffs that the Mandate exceeds the CDC's statutory authority, it does not reach Plaintiffs' alternative non-delegation claim.

### B. The Mask Mandate Improperly Invoked the Good Cause Exception to Notice and Comment Rulemaking

The APA requires that agencies provide an opportunity for the public to review and comment upon a new rule before it becomes legally binding. *See* 5 U.S.C. § 553(b). The agency must publish a notice in the Federal Register that includes "reference to the legal authority under which the rule is proposed," and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." § 553(b)(2). Following publication, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." § 553(c). This comment period must be at least thirty days. *See* § 553(d). Finally, the "agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

This process is known as "notice and comment." It "permits interested parties to criticize projected agency action before that action is embedded in a final rule and allows the agency to benefit from the parties' suggestions." *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981) (per curiam). It also "attempts to provide a 'surrogate political process'" to constrain the exercise of legislative power that Congress has delegated to an otherwise "undemocratic and unaccountable rulemaking process." *Dep't of*

*Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1929 n.13 (2020) (Thomas, J., concurring in the judgment in part and dissenting in part).

The CDC did not allow for public participation through notice and comment before issuing the Mask Mandate. Accordingly, promulgation of the Mandate violated the APA unless an exception to the ordinary rulemaking procedure applies. Despite its importance, the APA provides narrow exceptions to notice and comment. Two of those exceptions are relevant here. The first is when an agency action is not a rule. The second is when the agency properly invokes good cause to forego notice and comment.

### 1. The Mask Mandate Improperly Invoked the Order and Interpretative Rule Exceptions to Notice and Comment

The APA's notice-and-comment procedures apply only to agency rulemaking, *see* 5 U.S.C. § 553(b), which is the process of making a rule "of general or particular applicability and future effect," § 551(4)–(5). It does not apply to case-by-case "adjudication," which results in an "order." § 551(6)–(7); *see Neustar, Inc. v. FCC*, 857 F.3d 886, 893–96 (D.C. Cir. 2017) (Sentelle, J.) (explaining the distinction between rules and orders). Nor does it apply to an agency's "interpretative rules" or "general statements of policy," § 553(b), neither of which are binding on the public. *See Perez*, 575 U.S. at 103 (reciting "the longstanding recognition that interpretive rules do not have the force and effect of law").

Although the Mask Mandate itself claims that it is not a rule within the meaning of the APA, *see* 86 Fed. Reg. at 8030, the government abandoned that untenable position on review. The Mask Mandate is a generally applicable standard "governing conduct and rights." *See Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 620 (D.C. Cir. 1980) (Bazelon, J.). Thus, it is "clearly [a] rule[] subject to the notice and comment procedures required by the APA." *Id.* Accordingly, the sole question is whether the CDC had "good cause."

### 2.  The Mask Mandate Improperly Invoked the Good Cause Exception to Notice and Comment Rulemaking

Notice and comment does not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The Mandate invoked this exception to forego notice and comment. So, the Court must determine whether a thirty-day notice-and-comment period was "impracticable, unnecessary, or contrary to the public interest." *Id.*

This exception "is to be 'narrowly construed and only reluctantly countenanced.'" *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (Brown, J.) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (Randolph, J.)); *accord United States v. Dean*, 604 F.3d 1275, 1279 (11th Cir. 2010). It applies only "in

emergency situations" or "where delay could result in serious harm." *Dean*, 604 F.3d at

1281 (quoting *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)).

The "onus is on the [agency] to establish" this finding. *Action on Smoking &*

*Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 801 n.6 (D.C. Cir. 1983) (per curiam); *see*

*U.S. Steel Corp. v. U.S. EPA*, 595 F.2d 207, 213–14 (5th Cir. 1979) (concluding that the

agency "failed to show strong enough reasons to invoke" the good cause exception); *accord*

*Missouri*, 142 S. Ct. at 660 (Alito, J., dissenting) (explaining that the agency has the

"affirmative burden to show it has good cause"). Specifically, the APA requires that an

agency invoking good cause "incorporate[ its] finding and a brief statement of reasons" why

it believes notice and comment is "impracticable" or "contrary to the public interest."

§ 553(b)(B). Courts do not defer to the agency's conclusion on good cause. *See Mack*

*Trucks*, 682 F.3d at 93. The Court's review of the CDC's determination that good cause

exists "is limited to 'the grounds that the agency invoked when it took the action.'" *Regents*

*of the Univ. of Cal.*, 140 S. Ct. at 1907. The Court "may not supply a reasoned basis for

the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).

The Mandate asserted that "there [was] good cause to dispense with prior public

notice and comment" because—given "the public health emergency caused by COVID-

19[—]it would be impracticable and contrary to the public's health, and by extension the

public's interest, to delay the issuance and effective date of this Order." 86 Fed. Reg. at 8030. This statement, without more, is insufficient to establish good cause to dispense with notice and comment.

The Mandate's explanation—a single conclusory sentence—does not carry its burden to "show strong enough reason to invoke the [good cause] exception." *U.S. Steel Corp.*, 595 F.2d at 214. "A mere recitation that good cause exists . . . does not amount to good cause." *Zhang v. Slattery*, 55 F.3d 732, 746 (2d Cir. 1995), *superseded on other grounds by statute*, 8 U.S.C. § 1101(a)(42); *Action on Smoking*, 713 F.2d at 800 (explaining that "[b]ald assertions" are insufficient to show good cause). Nor does it allow the Court to "ensur[e] that [the CDC] engaged in reasoned decisionmaking." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1263 (11th Cir. 2020) (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)) (explaining that courts may not simply "rubber stamp" agency action).

The only reason the Mandate cites is "the public health emergency caused by COVID-19." 86 Fed. Reg. at 8030. That is "certainly support [for] the promulgation" of the Mandate, "[b]ut good cause to suspend notice and comment must be supported by more than the bare need [for the] regulations." *Marshall*, 628 F.2d at 621. And COVID-19 itself does not "*always*" justify an agency bypassing notice and comment. *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1290 (11th Cir. 2021). Instead, the agency must

"identif[y] specific reasons why . . . [there was] good cause for dispensing with the usual notice-and-comment requirements" in the particular "environment" the agency intended to regulate. *Id.* The Mandate does not do that.

Nor does the Mandate explain why a delay for public comment was contrary to the public's interest. Of course, delay—at least thirty days, *see* § 553(d)—is inherent in public comment. But the APA presupposes that participation from the regulated public produces benefits that outweigh the costs, at least in the ordinary course. *See Nat. Res. Def. Council v. NHTSA*, 894 F.3d 95, 114 (2d Cir. 2018) ("When, as here, the agency argues that its action is in the 'public interest,' a court will only agree 'in the rare circumstances when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." (quoting *Mack Trucks*, 682 F.3d at 95)). Besides its brief reference to the pandemic, the Mandate makes no effort to explain its reasoning that there was an exceptional circumstance at the time it implemented the rule.

The Mandate's terse conclusion contrasts markedly with another regulation that addressed the COVID-19 pandemic and invoked good cause to forgo notice and comment. When the Centers for Medicare and Medicaid Services (CMS) mandated that the staff of healthcare facilities receiving Medicare or Medicaid funding be vaccinated against COVID-19, it provided almost four pages of reasoning (with forty footnotes of supporting sources) on why there was good cause to forego notice and comment. *See* Medicare and

Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555, 61583–86 (Nov. 5, 2021). CMS "identified specific reasons" to dispense with notice and comment that it supported with "detailed explanation" on "the urgency presented by the ongoing pandemic, the outbreaks associated with the Delta variant, and the oncoming influenza season." *Dep't of Health & Hum. Servs.*, 19 F.4th at 1289–90. CMS also provided an estimated cost in human lives from a delay in issuing the vaccine mandate. *Id.* The Supreme Court concluded that this extensive reasoning properly invoked the good cause exception. *See Missouri*, 142 S. Ct. at 653–54. *But see id.* at 659–60 (Alito, J., dissenting) (reasoning for four Justices that even this explanation of good cause was insufficient). Unlike the CMS rule, the Mask Mandate mustered a single conclusory sentence to support its invocation of good cause.

The Mandate fares no better when compared to non-COVID-19-related regulations that invoked good cause. Courts have found longer and more detailed assertions of good cause deficient. *See, e.g., Mack Trucks*, 682 F.3d at 93–96 (concluding that the EPA lacked good cause despite the rule's four reasons to dispense with notice and comment and eight paragraphs of explanation (citing Nonconformance Penalties for On-Highway Heavy Heavy-Duty Diesel Engines, 77 Fed. Reg. 4678, 4680 (Jan. 31, 2012))). And short or conclusory claims of good cause often fail. *See, e.g., Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706–07 (D.C. Cir. 2014) (concluding that an FCC interim order's one

paragraph of explanation on why delay for notice and comment would cause "fiscal peril" was "simply too scant" because it did not include any factual findings); *Nat'l Venture Cap. Ass'n v. Duke*, 291 F. Supp. 3d 5, 17–19 (D.D.C. 2017) (concluding that DHS's three paragraphs of explanation on good cause did "not pass muster" (citing International Entrepreneur Rule: Delay of Effective Date, 82 Fed. Reg. 31887, 31888 (July 11, 2017))). The regulations that succeed often contain detailed and careful explanations of the agency's reasoning. *See Dean*, 604 F.3d at 1277 (concluding that the Attorney General's multiple reasons for issuing a rule without notice and comment were sufficient (citing Office of the Attorney General; Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. 8894, 8896–97 (Feb. 28, 2007))).

The CDC's failure to explain its reasoning is particularly problematic here. At the time when the CDC issued the Mandate, the COVID-19 pandemic had been ongoing for almost a year and COVID-19 case numbers were decreasing. (Doc. 48-1 at 2.) This timing undercuts the CDC's suggestion that its action was so urgent that a thirty-day comment period was contrary to the public interest. So too, the CDC's delay in issuing the Mandate further undercuts its position. The CDC issued the mandate in February 2021, almost two weeks after the President called for a mandate, eleven months after the President had declared COVID-19 a national emergency, and almost thirteen months since the Secretary of Health and Human Services had declared a public health emergency. This history

suggests that the CDC itself did not find the passage of time particularly serious. *See Nat. Res. Def. Council*, 894 F.3d at 114–15 (explaining that agency delay makes "good cause" more difficult to find). Nor did the CDC explain its reason for the delay. *Cf. Dep't of Health & Hum. Servs.*, 19 F.4th at 1290 & n.2 (suggesting that delay undermines a good-cause finding but crediting the agency's explanation for its delay).

To be sure, the CDC needed time to deliberate on its proposed rule. Ordinarily, some of that deliberation occurs during the thirty-day notice-and-comment period. *See* § 553(d) (requiring at least thirty days). Instead, the CDC here spent approximately two weeks considering and drafting the Mask Mandate after the President called for it. Since an agency need publish only "a description of the subjects and issues involved," § 553(b)(3), not a complete rule, the CDC and the public's deliberation process could have partially overlapped. So, providing for notice and comment may have added only another two weeks. Or the CDC could have issued the Mask Mandate as a binding, interim rule and allowed immediate notice and comment on a final version. *See, e.g., Dep't of Health & Hum. Servs.*, 19 F.4th at 1277 (explaining that HHS's "interim rule went into effect immediately" and provided a subsequent opportunity to comment).

Of course, the CDC "was not required to do any of this or to 'consider all policy alternatives in reaching [its] decision.'" *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1914–15 (quotation omitted). But the availability of these alternatives undermines its

39

conclusion that it had good cause to forego notice and comment due to the dangers of delay. *See Mid-Tex Elec. Coop., Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987) (Ginsburg, J.) (describing the "interim status of the challenged rule [as] a significant factor" in whether the agency had good cause). Even more so since the Mandate does not address why these commonsense approaches—which may have required minimal or no additional delay and certainly would have "allowed interested persons an opportunity to submit their views"—were infeasible or contrary to the public interest. *Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980).

Finally, the Mandate's failure to explain is especially troubling because the benefits of public comment were at their zenith. First, the Mandate governs the conduct of private individuals in their daily lives. Section 553(b) ordinarily provides them the opportunity "to participate in the formulation of the rules by which they are to be regulated." *See Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981). And the "more expansive the regulatory reach of [agency] rules, of course, the greater the necessity for public comment." *Id.*

Second, the public has a heightened interest in participating in a regulation that would constrain their choices and actions via threats of civil and criminal penalties. *See United States v. Gavrilovic*, 551 F.2d 1099, 1105 (8th Cir. 1977) ("When the consequence of agency rule making is to make previously lawful conduct unlawful and to impose criminal

sanctions, the balance of these competing policies imposes a heavy burden upon the agency to show public necessity."). Though the CDC did not "intend to rely primarily on" them, it "reserve[d] the right to enforce [the Mandate] through criminal penalties." 86 Fed. Reg. at 8030 n.33. Federal statutes provide that an individual who violates or "disregard[s]" regulations issued under § 264 may be fined a thousand dollars, imprisoned for up to a year, or fined and imprisoned. 42 U.S.C. § 271(a). Federal regulations similarly provide for a potential year of imprisonment for violators, but more "strongly encourage[] . . . widespread voluntary compliance," 86 Fed. Reg. at 8030 n.33, by providing for fines of up to $100,000 if the violation does not cause a death and up to $250,000 if it does result in a death. *See* 42 C.F.R. §§ 70.18, 71.2.

Applying these provisions, DHS protocols provide for a $500–$1,000 fine for first-time offenders and $1,000–$3,000 for repeat offenders. *See DHS to Increase Civil Penalties for Violations of the Federal Face Mask Requirement*, U.S. DEP'T OF HOMELAND SEC. (Sept. 9, 2021), https://www.dhs.gov/news/2021/09/09/dhs-increase-civil-penalties-violations-federal-face-mask-requirement. DHS also clarifies that these penalties are separate from any civil penalties that the FAA may impose for "unruly and unsafe behavior." *Id.*; *see also FAA Proposes Fines*, FED. AVIATION ADMIN. (May 24, 2021), https://www.faa.gov/newsroom/faa-proposes-fines-against-5-passengers-allegedly -interfering-flight-attendants (noting that 1,900 of the 2,500 reports of unruly passenger

behavior between January 1, 2021, and May 24, 2021, involved "passengers refusing to comply with the federal facemask mandate").

And finally, "[e]specially in the context of health risks, notice and comment procedures assure the dialogue necessary to the creation of reasonable rules." *Marshall*, 628 F.2d at 621 (describing novel public health measures as "exactly the kind of standard[s] which especially need[] the utmost care in [their] development and exposure to public and expert criticism").

Despite the public interests involved, the availability of alternatives, and the timing, the Mandate makes no effort to "show the impracticability of affording notice and comment," *U.S. Steel Corp.*, 595 F.2d at 213, or that doing so was contrary to the public interest. Nor is the Mandate's invocation of good cause sufficient for the Court to find that the CDC engaged in reasoned decisionmaking when it found good cause.

The government resists this conclusion, arguing that the CDC made a "common-sense finding" based on the record that delaying the Mandate would do real harm because it would lead to increased COVID-19 transmission. (Doc. 45 at 40.) Perhaps so. But, as explained above, the CDC failed to articulate that reasoning or connect its finding—if it did so find—to the record. *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1380 (Fed. Cir. 2017) ("[Courts] are limited to examining the reasons [the agency] cited

in [the rule] to justify its invocation of good cause."). The Court may not offer those findings for the agency.

The Court accepts the CDC's policy determination that requiring masks will limit COVID-19 transmission and will thus decrease the serious illnesses and death that COVID-19 occasions. But that finding by itself is not sufficient to establish good cause. "If the existence of a communicable disease alone permitted CDC to find 'good cause,' [then] CDC would seldom, if ever, need to comply with [notice and comment]." *Becerra*, 544 F. Supp. 3d at 1296–97; *cf. U.S. Steel Corp.*, 595 F.2d at 215 ("Were we to allow the [agency] to prevail on this point we would make the provisions of § 553 virtually unenforceable."). And the COVID-19 pandemic does not "*always* . . . justify an agency's bypassing the notice-and-comment process." *Dep't of Health & Hum. Servs.*, 19 F.4th at 1290. Far from it. Instead, the agency must—at the very least—"identif[y] specific reasons why in the environment of [the regulation] the ongoing pandemic constituted good cause." *Id.* The Mandate does not do that.

### 3.  The Mask Mandate's Failure to Provide Notice and Comment Was Not Harmless Error

When courts review agency action, they apply "the rule of prejudicial error." 5 U.S.C. § 706. In other words, a court should not "set aside" an agency action unless an administrative error was harmful. *Id.* But that rule applies only "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the

substance of the decision reached." *U.S. Steel Corp.*, 595 F.2d at 215 (quotation omitted). And an agency's "complete failure" to comply with administrative procedures requires only "a minimal showing of prejudice" to defeat a claim of harmless error. *Mid Continent Nail*, 846 F.3d at 1384.

Since the CDC's failure to use notice and comment here "plainly affected the procedure used, [the Court] cannot assume that there was no prejudice" to Plaintiffs. *U.S. Steel Corp.*, 595 F.2d at 215 (reasoning that failure to provide pre-promulgation notice and comment was prejudicial despite a post-promulgation opportunity for comment). Indeed, "the entire premise of notice-and-comment requirements is that an agency's decisionmaking may be affected by concerns aired by interested parties." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020).

As a result, "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002); *see also U.S. Steel Corp.*, 595 F.2d at 215 ("Absence of such prejudice must be clear for harmless error to be applicable."). Plaintiffs provide at least a "minimal showing" that they were prejudiced by the lack of notice and comment. *Mid Continent Nail*, 846 F.3d at 1384. Specifically, they contest the studies and resources that the CDC relied upon and point to other resources that the CDC did not consider. (Doc. 48 at 44, 48–49.) Plaintiffs Pope and Daza,

as individuals who are at risk of anxiety or panic attacks while wearing masks, were well-positioned to contest the scope of the Mandate's medical exception. (Doc. 48-2; Doc. 48-3.) And, of course, Plaintiffs could have challenged the CDC's legal basis for regulating private conduct under the threat of criminal penalties through § 264(a). Thus, Plaintiffs "have presented enough to show that on remand they can mount a credible challenge to the [Mandate] and were thus prejudiced by the absence of an opportunity to do so before" the Mandate was issued. *Util. Solid Waste Activities Grp.*, 236 F.3d at 755.

The government disagrees, asserting that the error was harmless. It "presume[es]" that Plaintiffs' comments would have "focused primarily" on "dubious assertions" that would not have changed the CDC's mind. (Doc. 45 at 42.) But the Court does not dole out indulgences for bypassing notice and comment merely because an agency has its mind made up. *Cf. Action on Smoking*, 713 F.2d at 800 ("Bald assertions that the agency does not believe comments would be useful cannot create good cause to forgo notice and comment procedures.").

The government's blithe dismissal aside, the Court may not so lightly conclude that public input would have been inconsequential in a rule directly regulating individual conduct. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014) (Silberman, J.) ("[Courts] have not been hospitable to government claims of harmless error in cases in which the government violated § 553 of the APA by failing to provide notice.").

"Section 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *U.S. Steel Corp.*, 595 F.2d at 214. The CDC's decision denied Plaintiffs (and the public) that opportunity to affect the outcome.

But more than outcomes are at stake. Process matters too. Notice and comment requirements "are not mere procedural niceties." *Dep't of Health & Hum. Servs.*, 19 F.4th at 1304 (Lagoa, J., dissenting). The "essential purpose" of notice and comment is "to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980) (Bazelon, J.). The government's response obscures that. And its behavior denied it. Even aside from Plaintiffs' showing, that alone is prejudicial error.

Since the CDC issued the Mask Mandate "without observance of procedure required by law," the Court must "hold [it] unlawful and set [it] aside." 5 U.S.C. § 706(2); *see Wheeler*, 955 F.3d at 85 (explaining that failure to provide notice and comment "is a fundamental flaw that normally requires vacatur of the rule" (quotation omitted)).

### C. The Mask Mandate is Arbitrary and Capricious Because the CDC Failed to Adequately Explain its Reasoning

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). "It requires agencies engage in 'reasoned decisionmaking.'" *Regents*

*of the Univ. of Cal.*, 140 S. Ct. at 1905 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). When they fail to do so, courts must "set aside" their actions as "arbitrary" or "capricious." 5 U.S.C. § 706(2).

Plaintiffs raise three arguments on why the Mask Mandate was arbitrary and capricious. First, Plaintiffs argue that the Mandate failed to comply with 42 C.F.R. § 70.2. Second, that the Mandate was substantively unreasonable. And third, that the Mandate failed to adequately explain the CDC's reasoning. (Doc. 48 at 48–49; Doc. 51 at 13–15.) Because the Court agrees with Plaintiffs that the CDC failed to adequately explain its reasoning, the Court need not address whether the substantive decisions embodied in the Mandate were themselves arbitrary or capricious or whether the Mandate violated 42 C.F.R. § 70.2.

The APA's arbitrary and capricious review is "narrow." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quotation omitted). The Court may not "substitute its judgment for that of the agency." *Id.* (quotation omitted). Instead, the Court is limited to ensuring that "an agency's exercise of discretion [was] both reasonable and reasonably explained." *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 937 (D.C. Cir. 2017) (Kavanaugh, J.).

An agency decision is reasonably explained when the agency demonstrates that it engaged in "reasoned decisionmaking." *Michigan*, 576 U.S. at 750. To do so, "the agency

must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The articulated rationale must also be adequate to explain all major aspects of the decision. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1907, 1910–12. While courts "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," they "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quotations omitted).

Although a closer question than the failure to properly invoke the good cause exception, the Mask Mandate fails this reasoned-explanation standard. Beyond the primary decision to impose a mask requirement, the Mask Mandate provides little or no explanation for the CDC's choices. Specifically, the CDC omits explanation for rejecting alternatives and for its system of exceptions. And there are many, such that the overall efficiency of masking on airplanes or other conveyances could reasonably be questioned.

The Mandate does not address alternative (or supplementary) requirements to masking, such as testing, temperature checks, or occupancy limits in transit hubs and conveyances. It also does not explain why all masks—homemade and medical-grade—are sufficient. Nor does it require "social distancing [or] frequent handwashing," despite finding these effective strategies for reducing COVID-19 transmission. 86 Fed. Reg. at

8026. Of course, the CDC did not need to explore "every alternative device and thought conceivable by the mind of man." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978). But an agency "must consider and explain its rejection of 'reasonably obvious'" or "significant and viable" alternatives. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (quotations omitted).

Even if these alternatives were not so obvious that the CDC had to explain its decision to reject them, the Mandate fails to explain other significant choices. For example, the Mandate relies on studies explaining that "universal masking" reduces transmission of COVID-19 at the community level. 86 Fed. Reg. at 8028. But the Mandate does not require universal masking. It exempts individuals who are "eating, drinking, or taking medication" and a person who is "experiencing difficulty breathing" or who is "feeling winded." 86 Fed. Reg. at 8027 & n.7. It also excludes individuals who cannot wear a mask due to an ADA-recognized disability and all children under two years old. *See* 86 Fed. Reg. at 8027–28 (providing other unexplained exceptions). The Mandate makes no effort to explain why its purposes—prevention of transmission and serious illness—allow for such exceptions. Nor why a two-year-old is less likely to transmit COVID-19 than a sixty-two-year-old. The CDC does not "articulate a satisfactory explanation"—or any explanation at all—"for its action" and fails to include a "rational connection between the facts found and

the choices made." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quotation omitted). Instead, it simply announces the exceptions.

The government disagrees, asserting that the CDC is entitled to strong deference on the scientific, medical, and policy issues underlying the Mask Mandate. True enough. Agency decisions on such "line-drawing" questions as whether a newborn or a three-year-old child must wear a mask are entitled to considerable deference. *See Nat'l Shooting Sports Found.*, 716 F.3d at 214. So too, that "wide discretion" applies to the CDC's decision to limit medical exceptions to the ADA's definition of disability. *Id.* (quotation omitted). But while the CDC is not required to "identify the optimal threshold," it *is* "required to identify the standard and explain its relationship to the underlying regulatory concerns." *Id.* (quotation omitted).

The same deference-and-explanation formula applies to agency decisions involving scientific uncertainty. When "an agency is obliged to make policy judgments" based on limited data, courts grant substantial deference to agency judgments. *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C. Cir. 1999) (quotation omitted). But courts must still ensure that the agency states its "policy judgment[]" and "go[es] on to identify the considerations it found persuasive" in reaching that judgment. *Id.* (quotation omitted). The CDC did not do that here.

In the same way, agencies "are permitted to rely on their experience in the regulated field" in crafting rules, but only "so long as they explain what their experience is and how that experience informs the agency's conclusion." *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1322 (11th Cir. 2021). If the CDC relied on its experience in deciding, for example, that an exception for two-year-olds was an acceptable compromise while an extension to three-year-olds would not be, the CDC did not say so. *See id.* (explaining that agencies may rely on their experience unless "the agency fails to actually explain what that experience was and how that experience supports the promulgated regulation").

In sum, irrespective of whether the CDC made a good or accurate decision, it needed to explain why it acted as it did. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1907 (noting that agency decisions must be "adequately explained"). Since the CDC did not explain its decision to compromise the effectiveness of its Mandate by including exceptions or its decision to limit those exceptions, the Court cannot conclude that the CDC "articulated a 'rational connection between the facts found and the choices made.'" *Jifry*, 370 F.3d at 1180 (quotation omitted). And so, the decision is arbitrary and capricious and due to be "set aside" and remanded to the agency. *See* 5 U.S.C. § 706; *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916 (describing remand as the appropriate remedy); *accord Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136,

1151 (D.C. Cir. 2005) (noting that remand with vacatur is "normally warrant[ed]" for inadequately supported agency actions).

The government disagrees, asserting that the CDC must have considered the question of medical exceptions and the age cut-off because it granted some exceptions. (Doc. 45 at 37–38.) This argument understates the agency's burden.

The agency must consider the essential aspects of the problem and act reasonably, as the government claims that the CDC did. That is necessary, but not sufficient alone. It must also explain its decision with enough particularity that a reviewing court can determine that it used its discretion appropriately. The CDC did not do that. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 ("The fact that there may be a valid reason . . . does not establish that [the agency] considered [it] . . . ."). It didn't even try to explain. And the Court may only consider "the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758; *see Regents of the Univ. of Cal.*, 140 S. Ct. at 1909–10 ("An agency must defend its actions based on the reasons it gave when it acted."). The government may not supply "'post hoc' rationalizations." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). So too, the "reviewing court should not attempt itself to make up for . . . deficiencies" in the agency's explanation of its rule and "may not supply a

reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quotation omitted).

Without a contemporaneous explanation, the Court cannot conclude that the CDC "reasonably considered the relevant issues and reasonably explained the decision." *FEC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Nor can the Court "ensure that [the CDC] engaged in reasoned decisionmaking." *Nat'l Mining Ass'n*, 985 F.3d at 1321. Accordingly, the Mandate is due to be set aside as arbitrary and capricious and "remand[ed] to [the CDC]." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916.

### D. The Mask Mandate is Vacated for Violating the APA

As explained above, the Mask Mandate exceeds the CDC's statutory authority and violates the APA. Plaintiffs ask the Court to declare it unlawful and set it aside. (Doc. 51 at 16.) This remedy mirrors the relief they sought in their Amended Complaint. (Doc. 39 at 29.) The government argues that Plaintiffs' relief is limited to a declaratory judgment and, even if other relief is awarded, it should be limited to non-enforcement of the Mask Mandate against Plaintiffs. (Doc. 50 at 25.)

The APA requires that courts "hold unlawful and set aside agency action" that violates the APA or exceeds the agency's authority. 5 U.S.C. § 706. Courts have long interpreted this provision as authorizing vacatur. Indeed, "vacatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271,

1290 (11th Cir. 2015) (quotation omitted); *accord Allina Health Servs.*, 746 F.3d at 1110 (describing vacatur as "the normal remedy" for an APA violation); *Advocs. for Highway & Auto Safety*, 429 F.3d at 1151 ("[U]nsupported agency action normally warrants vacatur . . . ."). Some judges even reason that the APA mandates vacatur and permits of no other, lesser remedy. *See Checkosky v. SEC*, 23 F.3d 452, 492 (D.C. Cir. 1994) (Randolph, J., separate opinion) ("[O]ur decisions uniformly—and quite firmly—hold that § 706[] requires us to vacate . . . ."); *accord Milk Train, Inc. v. Veneman*, 310 F.3d 747, 757 (D.C. Cir. 2002) (Sentelle, J., dissenting) (explaining that remand to the agency without vacatur violates the APA). And vacatur ordinarily applies to the rule generally, not to just the plaintiffs in a suit. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989))); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 n.8 (2020) (explaining that, when "a provision [of law] is declared invalid[,]" the invalid provision "cannot be lawfully enforced against others"—not just "against the plaintiff").

Additionally, the recognized exceptions to vacatur for APA violations do not apply here. In deciding whether to award less-than-vacatur relief, courts frequently consider

(1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993); *see also Black Warrior Riverkeeper*, 781 F.3d at 1290 (relying on this test). Here, the CDC cannot correct the serious deficiencies on remand nor is the Mask Mandate a rule necessitating a significant administrative winddown period. And, of course, the government never asked for remand to the CDC without vacatur.

While the Court recognizes the criticism about nationwide injunctive relief and admittedly shares some of the skepticism about it, *see Health Freedom Def. Fund, Inc. v. Biden*, ___ F. Supp. 3d ___, 2021 WL 5416688, at *5 & n.4 (M.D. Fla. 2021) (Mizelle, J.), the weight of authority and judicial practice instructs that vacatur is an appropriate remedy for an APA violation. *See, e.g., Black Warrior Riverkeeper*, 781 F.3d at 1290; *Alabama v. CMS*, 674 F.3d 1241, 1244 (11th Cir. 2012) (per curiam) (affirming the vacatur of an agency rule that violated the APA's notice-and-comment requirements); *Nat'l Mining Ass'n v. Sec'y of Lab.*, 153 F.3d 1264, 1269 (11th Cir. 1998) (vacating an agency rule for failing to comply with statutory requirements). The government, aside from a single sentence in its response, (Doc. 50 at 25), does not brief the propriety of vacatur. Nor does it address whether an injunction, which is often entered in a preliminary posture, and

vacatur, which follows final judgment, are comparable.[4] *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (describing complete vacatur as a "less drastic remedy" than an injunction); *CMS*, 674 F.3d at 1244–45 (discussing vacatur and an injunction as separate remedies); *see also O.A.*, 404 F. Supp. 3d at 118 ("As a result, vacatur—*i.e.*, nullification—of the Interim Final Rule obviates any need for the issuance of an injunction.").

There is another, independent reason supporting vacatur: Such relief is necessary to grant complete relief to Plaintiffs. Whatever doubts surround nationwide injunctive relief in general, there is no doubt that an Article III court "may administer complete relief between the parties, even [if] this involves the determination of legal rights which otherwise would not be within the range of its authority." *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring) (explaining that historic equity permitted relief to benefit third parties if it

---

[4] The government contends that Plaintiffs are estopped from seeking an injunction because they earlier represented to the Court that they were seeking a declaratory judgment and that the Court relied upon that representation in denying the government's motion to transfer. (Doc. 50 at 25.) This argument is misplaced. First, the Plaintiffs never sought an injunction in this case, preliminary or otherwise. Second, in denying the government's motion to transfer, the Court relied on numerous differences between this case and the pro se-prosecuted case pending in a different division within the Middle District of Florida, only one of which highlighted that the plaintiff there had sought a temporary restraining order, a preliminary injunction, and a permanent injunction while Plaintiffs here did not. (Doc. 35 at 8.) Third, after denying the government's motion to transfer, Plaintiffs filed an Amended Complaint in this case, realleging the relief of a declaratory judgment and to set the Mandate aside. (Doc. 39 at 29.) The Court does not see how—even assuming an injunction and vacatur are identical relief—Plaintiffs are estopped when they sought this very relief in the Amended Complaint and never took any subsequent action that could be deemed a waiver or forfeiture of that kind of relief.

was "merely a consequence of providing relief to the plaintiff"). Stated simply, incidental benefit to non-parties does not deprive Article III courts of exercising their "historic power of equity to provide complete relief" to the plaintiffs before it. *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960).

And awarding complete relief here requires vacatur. The difficulty of distinguishing the named Plaintiffs from millions of other travelers—both for government actors and the myriad of private companies, individuals, and local governments bound to enforce the Mandate with "best efforts"—almost ensures that a limited remedy would be no remedy at all. How is the ride-sharing driver, flight attendant, or bus driver to know someone is a Plaintiff to this lawsuit with permission to enter mask-free? The identification problem is compounded further for the geographically dispersed members of Health Freedom Defense Fund.[5] *See Dep't of Health & Hum. Servs.*, 19 F.4th at 1282 (explaining that "universal relief may be justified where the plaintiffs are dispersed throughout the United States"). There seems to be no adequate assurances that the government can provide that its agents or an unwitting "enforcer" will not violate this Court's order and deprive Plaintiffs of their relief. Thus, complete vacatur—in addition to being the "ordinary APA remedy,"

---

[5] The Court takes judicial notice of the fact that Health Freedom Defense Fund has members throughout the country. *See Health Freedom Def. Fund, Inc. v. Roark*, No. 1:21-cv-406 (D. Idaho Oct. 15, 2021) (challenging an Idaho school mask mandate and alleging that members of the Fund reside in Idaho); *Health Freedom Def. Fund, Inc. v. Reilly*, 2:21-cv-8688 (C.D. Cal. Nov. 3, 2021) (challenging Los Angeles school district's staff vaccine mandate and alleging that members of the Fund reside in California).

*Black Warrior Riverkeeper*, 781 F.3d at 1290 (quotation omitted)—is necessary to remedy Plaintiffs' injury.

## IV.   CONCLUSION

"It is indisputable that the public has a strong interest in combating the spread of [COVID-19]." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490. In pursuit of that end, the CDC issued the Mask Mandate. But the Mandate exceeded the CDC's statutory authority, improperly invoked the good cause exception to notice and comment rulemaking, and failed to adequately explain its decisions. Because "our system does not permit agencies to act unlawfully even in pursuit of desirable ends," *id.*, the Court declares unlawful and vacates the Mask Mandate.

Accordingly, the following is **ORDERED**:

1.   Plaintiffs' Motion for Summary Judgment (Doc. 48) is **GRANTED** on Counts I, II, and III. Defendants' Motion for Summary Judgment (Doc. 45) is **DENIED**.

2.   The Court **DECLARES UNLAWFUL** and **VACATES** the Mask Mandate, remanding it to the CDC for further proceedings consistent with this order.

3.    The Court directs the Clerk to **TERMINATE** President Joseph R. Biden, Jr., as a Defendant to this action, to **ENTER** final judgment in favor of Plaintiffs as prescribed in this order, and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on April 18, 2022.

Kathryn Kimball Mizelle
United States District Judge